# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| HELENE HUTT, Derivatively on Behalf of OCWEN FINANCIAL CORPORATION, | Civil Action No. |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| WILLIAM C. ERBEY, RONALD M. FARIS, RONALD J. KORN, WILLIAM H. LACY, BARRY N. WISH, ROBERT A. SALCETTI, WILBUR L. ROSS, and JOHN V. BRITTI, | **JURY DEMAND** |
| Defendants, | |
| - and - | |
| OCWEN FINANCIAL CORPORATION, a Florida Corporation, | |
| Nominal Defendant. | |

The allegations in this Complaint are based upon personal knowledge as to the actions of Helene Hutt ("Plaintiff") and her ownership of shares of Ocwen Financial Corporation ("Ocwen" or the "Company"), and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of her counsel, which included, among other things: (a) review and analysis of the Company's Proxy Statements and other public filings with the Securities and Exchange Commission ("SEC"); (b) review of other publicly available information, including articles in the news media; (c) review of information on the Company's website and press releases; (d) review of complaints and related materials in litigations commenced against some or all of the Individual Defendants and/or the Company; (e) review of information disclosed as a result of various regulatory investigations and proceedings; and (f) communications with Ocwen's counsel.

## INTRODUCTION

1.     This is a shareholder derivative action brought for the benefit of Nominal Defendant Ocwen.  This derivative action is brought against certain members of the Company's Board of Directors (the "Board") and certain of its executive officers (collectively, the "Individual Defendants" defined herein)

regarding their breaches of fiduciary duty during the period beginning March 1, 2013 through the present (the "Relevant Period").

2.      Nominal Defendant Ocwen is the largest non-bank mortgage servicer of subprime loans in the United States (and fourth largest mortgage servicer overall), collecting payments on nearly $455 billion in loans as of the fourth quarter of 2013.   The Company has two operating segments, Servicing and Lending. Through its Servicing segment, Ocwen provides residential and commercial mortgage loan servicing, special servicing, and asset management services to owners of mortgage loans and foreclosed real estate in the United States and internationally.   The Company essentially acts as a third-party collection agency for banks and other entities that own mortgage portfolios, collecting payments from mortgage borrowers and handling other billing services.   The Company's Lending segment is involved in originating and purchasing conventional and government insured residential forward and reverse mortgage loans primarily through its correspondent lending arrangements.

3.      The Individual Defendants' breaches of fiduciary duties arise from a continuous and systematic course of misconduct that occurred at every stage of the mortgage servicing process, including but not limited to: (1) taking advantage of

3

homeowners with servicing shortcuts and unauthorized fees; (2) deceiving consumers about foreclosure alternatives and improperly denying loan modifications; (3) engaging in illegal foreclosure practices; (4) participating in and/or allowing self-dealing transactions at the expense of mortgage investors, borrowers and/or Ocwen shareholders; (5) forcing mortgagees to enter into non-disparagement clauses in order to receive mortgage modifications as described herein; (6) failing to implement a system of internal controls thus causing the Company to repeatedly violate federal and state consumer financial protection laws and financial reporting laws; (7) making false and/or misleading statements in the Company's SEC filings subjecting Ocwen to expensive and onerous enhanced regulatory requirements and causing the Company to restate its financials for the fiscal year ended December 31, 2013 and the first quarter ended March 31, 2014; and (8) failing to timely file the Company's Form 10-K and Annual Report for fiscal year 2014 causing Ocwen to face delistment.

4.     As a result of these revelations, the Company has been subjected to multiple government investigations that have resulted in multi-million dollar fines, as well as a securities class action lawsuit alleging violations of the federal securities laws titled, *In re Ocwen Financial Corporation Securities Litigation*,

Case No: 9:14-cv-81057,  which is pending before the Southern District of Florida (hereinafter the "Securities Class Action").

5.      This action seeks damages from the Individual Defendants on behalf of the Company. As required by the Florida Business Corporation Act, § 607.07401 because Ocwen is a Florida company, Plaintiff made a demand on the Board on June 3, 2014 with respect to the matters alleged in this Complaint (the "June Demand").  On September 3, 2014, in light of new information that had become disclosed regarding the Company, Plaintiff made a supplemental demand on the Board (the "Supplemental Demand" and collectively with the June Demand, the "Demands"). The Demands are deemed refused for a number of reasons. First, Defendants have failed to adequately response to the Demands by allowing counsel for the Company, who owes a duty of undivided loyalty to the Individual Defendants named in the Demands, to exercise control over and speak on behalf of the purported Special Litigation Committee ("SLC"), formed by the Board to investigate the Demands.  Company's counsel's role in controlling and speaking for the SLC raises serious concerns regarding whether the SLC is conducting an independent and objective investigation into the matters raised in the Demands. Second, despite numerous requests by Plaintiff to receive documentation regarding

5

the SLC's formation and investigation, for the purpose of ensuring that the SLC is independent and its investigation objective, no SLC documentation has been produced to Plaintiff to date. This refusal is not, and could not possibly be, in good faith. Third, two members of the three person SLC, who were originally tasked with investigating the Demands have seen been replaced at the eleventh hour with *new* members.  Specifically, *nine months* after the formation of the SLC and start of the SLC's investigation into the Demands, two directors of the three person SLC were replaced, resulting in an SLC whose authority to make a critical decision of whether to dismiss the claims in the Demands or pursue them, will now be based on an investigation that the majority of the SLC members have not truly partaken in. The third member lacks the independence and disinterested required to be a proper SLC member because he is a named in the Demands, and as a defendant in this action, and therefore is directly implicated in the very wrongdoing that he is responsible for investigating. As a result, the SLC lacks the requisite good faith to perform a reasonable investigation.   Fourth, despite Plaintiff allowing the SLC more than an adequate enough time to finish its investigation, the SLC has now informed Plaintiff of their decision to "defer" reaching *any* conclusion regarding the claims alleged in the Demands and, more egregiously, have stopped its investigation of the Demands

all together.   Plaintiff is entitled to have her claims alleged in the Demands investigated in a reasonable time and manner and the damages alleged therein remedied.   Based on the foregoing, Plaintiff is left no other recourse but to bring this action on behalf of the Company so that the interests of the Company are adequately protected.

## JURISDICTION AND VENUE

6.   This Court has jurisdiction over the subject matter of this action because the claims asserted herein arise in part under § 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and Regulation 14a-9 promulgated thereunder by the SEC.  Jurisdiction is therefore proper under 28 U.S.C. § 1331, because Plaintiff's claims arise under the Constitution, laws, or treaties of the United States. Supplemental jurisdiction over Plaintiff's state-law claims is conferred by 28 U.S.C. § 1367.

7.   Alternatively, this Court has subject matter jurisdiction under 28 U.S.C. § 1332. There is complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

8.   Venue is proper in this District pursuant to 28 U.S.C. §1391 because (i) one or more of the Defendants either resides or maintains executives offices in

the District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in the District; and (iii) Defendants have received substantial compensation and other transfers of money in the District by doing business and engaging in activities having an effect in the District.

PARTIES

9.      Plaintiff Helene Hutt is currently and has continuously been a stockholder of Ocwen since 2009.  Plaintiff Hutt is a citizen of Vermont.

10.     Nominal Defendant Ocwen is a corporation organized under the laws of Florida with its principal executive office located in Atlanta, Georgia.  According to the Company's SEC filings, the Company is a financial services holding company that, through its subsidiaries, is one of the largest mortgage servicing companies in the United States.  Ocwen is a publicly traded corporation whose stock is listed and traded on the New York Stock Exchange.

11.     Defendant William C. Erbey ("Erbey") is a co-founder of Ocwen and served as the Executive Chairman of the Board from September 1996 until his resignation on January 16, 2015.  Previously Erbey served as the Chief Executive Officer ("CEO") of Ocwen from January 1988 to October 2010 and as the President of Ocwen from January 1988 to May 1998.   Defendant Erbey was also the former

Chairman of the Board of Directors of Altisource Portfolio Solutions S.A. ("Altisource"), Home Loan Servicing Solutions ("HLSS"), Altisource Asset Management Corporation ("AAMC") and Altisource Residential Corporation ("Residential"), Ocwen's four affiliated spin-off companies.  Defendant Erbey resigned from his position as Chairman and as a member of the board of directors of the four spin-off companies on January 16, 2015.  In fiscal 2013, Erbey received total compensation of over $2.9 million from Ocwen.  Erbey is a citizen of St. Croix, U.S. Virgin Islands.

12.    Defendant Ronald M. Faris ("Faris") has served as a Director of Ocwen since May 2003, as the President of Ocwen since March 2001 and as CEO since October 2010.  Faris is a member of the Board's Executive Committee and the Compliance Committee.  In 2013, Faris received total compensation of over $1.6 million from Ocwen.  Faris is a citizen of Florida.

13.    Defendant Ronald J. Korn ("Korn") has served as a Director of Ocwen since May 2003.  Korn is the Chairman of the Audit Committee and a member of the Compensation Committee of the Board.  Korn received total compensation of $125,000 from Ocwen in 2013.  Korn is a citizen of Florida.

14.    Defendant William H. Lacy ("Lacy") has served as a Director of Ocwen since May 2002.  Lacy is the Chairman of the Compensation Committee and a member of the Board's Nomination/Governance Committee.  In 2013, Lacy received total compensation of $120,000 from Ocwen.  Lacy is a citizen of Wisconsin.

15.    Defendant Robert A. Salcetti ("Salcetti") has served as a Director of Ocwen since January 2011.  Salcetti is the Chairman of the Compliance Committee and is a member of the Audit Committee and the Nomination/Governance Committee.  In 2013, he received $128,050 in total compensation from Ocwen. Salcetti is a citizen of Texas.

16.    Defendant Barry N. Wish ("Wish") has served as Chairman Emeritus of the Board of Directors of Ocwen since September 1996 and has served as Chairman of the Board since January 17, 2015.   Wish is Chairman of the Nomination/Governance Committee and a member of the Executive, Compliance and Audit Committees of the Board.  Defendant Wish is a co-founder of Ocwen and has served on its Board since 1988.   Defendant Wish previously served as Chairman of the Board from 1988 to September 1996.  On various dates beginning in November 2012 and ending in November, 2013, Wish sold 1.3 million shares of

Ocwen stock at fraudulently inflated prices for proceeds in excess of $57 million. Wish is a citizen of Florida.

17.    Defendant John V. Britti ("Britti") has served as the Company's Executive Vice President & Chief Investment Officer since June 2014.  Britti previously served as Ocwen's Chief Financial Officer ("CFO") from March 2012 until June 2014.  He has worked at Ocwen since January 2011.  Britti is a citizen of Georgia.

18.    Defendant Wilbur L. Ross, Jr. ("Ross") served as a Director of Ocwen from March 2013 until his resignation on November 20, 2014.  Ross was a member of the Compliance Committee and the Compensation Committee.  Ross is a citizen of Florida.

19.    Defendants Erbey, Faris, Korn, Lacy, Wish, Salcetti, Ross and Britti are collectively referred to herein as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

20.    By reason of their positions as officers, directors and/or fiduciaries of Ocwen during  the Relevant Period and because of their ability to control the business and corporate affairs of  the Company, the Individual Defendants owed Ocwen and its shareholders fiduciary obligations of  good faith, candor, loyalty

and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Ocwen and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

21.    Each director and officer of the Company owes to Ocwen and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

22.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ocwen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Due to their positions with Ocwen, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

23.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies,

12

practices and controls of the Company. By virtue of such duties, the officers and directors of Ocwen were required to, among other things:

a.      Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.      Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.      Exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

d.      Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

e.    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

24.    Moreover, Ocwen maintains a Code of Business Conduct and Ethics (hereinafter "Code of Conduct"), which applies to the Company's employees, officers and directors, and a Code of Ethics for Senior Financial Officers (hereinafter "Code of Financial Ethics") that applies to the Company's CEO and CFO.

**Code of Conduct**

25.    The purpose of the Code of Conduct is to reinforce and enhance the Company's commitment to an ethical way of doing business.  The Code of Conduct states in relevant part:

**About the Code of Business Conduct and Ethics**

Ocwen Financial Corporation and its subsidiaries ("Ocwen" or the "Company") are committed to the highest standards of business conduct in our relationships with each other and with our customers/clients, suppliers, shareholders and others.  This requires that we conduct our business in accordance with all applicable laws and regulations and in accordance with the highest standards of business ethics.

**RESPONSIBILITY TO OUR ORGANIZATION**

Ocwen employees and members of the Board are expected to dedicate their best efforts to Company business and to avoid any conflicts with the interests of Ocwen.

## Conflicts of Interest

In order to maintain the highest degree of integrity in the conduct of Ocwen's business and to maintain your independent judgment, you must avoid any activity or personal interest that creates or appears to create a conflict between your interests and the interests of the Company. A conflict of interest occurs when your private interests interfere in any way, or even appear to interfere, with the interests of the Company as a whole. A conflict situation can arise when you take actions or have interests that make it difficult for you to perform your company work objectively and effectively. You should never act in any manner that could cause you to lose your independence and objectivity or that could adversely affect the confidence of our customers/clients, suppliers, directors or fellow employees in the integrity of Ocwen of its procedures.

## Financial Interests in Other Businesses

Ocwen employees, members of the Board, and their immediate families may not have an ownership interest in any other enterprise if that interest compromises or appears to compromise the employee's loyalty to Ocwen. For example, you may not own an interest in a company that competes with Ocwen. You may not own an interest in a Company that does business with Ocwen (such as an Ocwen customer/client or supplier) without the prior written approval of the senior-most executive of Internal Audit and/or the General Counsel. Executive officers and members of the Board must obtain the written approval of the Audit Committee of the Board of Directors (the "Audit Committee") before making any such investment. However, it is not considered a conflict of interest (and therefore, prior approval is not required) to make investments of less than 5% of the outstanding

common stock in competitors, customers/clients or suppliers that are listed on a national or international stock exchange.

## Corporate Opportunities

As employees, officers and directors of Ocwen, we owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.  ***You may not take for yourself, opportunities that are discovered through the use of corporate property, information or position to use corporate property, information or position for personal gain***.  Nor may you compete with the Company.

## Company Books and Records

You must complete all Company documents accurately, truthfully and in a timely manner…You must record the Company's financial activities in compliance with all applicable laws and accounting practices.  The making of false or misleading entries, records or documentation is strictly prohibited.

## Relationships with Auditors

It is every employee's responsibility to make open and full disclosure to, and cooperate fully with, outside accountants in connection with audit or review of the Company's financial statements.  You must not knowingly provide an auditor with inaccurate or misleading legal or financial analysis.  Further, you must not act in any way which may be perceived as coercing, manipulating, misleading or fraudulently influencing any independent public or certified public accountant engaged in the performance of an audit or review of the Company's financial statements or other business functions.

## FAIR DEALING

Ocwen depends on its reputation for quality, service and integrity. The way we deal with our customers/clients, competitors and

16

suppliers molds our reputation, builds long-term trust and ultimately determines our success.  You should endeavor to deal fairly with the Company's customers/clients, suppliers, competitors, directors, and employees.  ***We must never take unfair advantage of others through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practice.***  Any comparisons with the competition used in any public forum or presentation must be represented fairly and accurately.

\*\*\*

## Code of Financial Ethics

26.    The Code of Financial Ethics states in relevant part:

Ocwen is committed to full and accurate financial disclosure in compliance with applicable laws, rules, regulations and to maintaining its books and records in accordance with applicable accounting policies, laws, rules and regulations.

**Conflicts of Interest**

In order to maintain the highest degree of integrity in the conduct of Ocwen's business and your independent judgment, you must avoid any activity or personal interest that creates or appears to create a conflict between your interests and the interests of Ocwen.  A conflict of interest occurs when your private interests interfere in any way, or even appear to interfere, with the interests of Ocwen as a whole.  You should conduct the Company's business in an honest and ethical manner and never act in a manner that could cause you to lose your independence and objectivity.    Any material transaction or relationship that reasonably could be expected to give rise to a conflict must be reported to the Audit Committee.

17

**Disclosures in Periodic Reports**

As a public company, Ocwen is required to file various periodic reports with the Securities and Exchange Commission. It is Company policy to make full, fair, accurate, timely and understandable disclosure in compliance with all applicable laws and regulations in all required periodic reports and other public communications.

## The Audit Committee

27.     According to the Company's Proxy Statements filed with the SEC on April 3, 2013 ("2013 Proxy") and April 22, 2014 ("2014 Proxy"), the Board's Audit Committee "oversees the relationship with our independent registered public accounting firm, reviews and advises our Board of Directors with respect to reports by our independent registered public accounting firm and monitors our compliance with laws and regulations applicable to our operations. Audit Committee oversight also includes the evaluation of significant matters relating to the financial reporting process and our system of internal accounting controls. Additionally, the Audit Committee reviews the scope and results of the annual audit conducted by the independent registered public accounting firm."

28.     During the Relevant Period, Defendants Korn, Salcetti and Wish served on the Audit Committee. Additionally, pursuant to the 2014 Proxy, all three members of the Audit Committee qualified as an audit committee financial expert

in accordance with the rules and regulations promulgated by the SEC.  As members of the Audit Committee, Defendants Korn, Salcetti and Wish had an affirmative duty of oversight and responsibility for the integrity of the Company's financial reporting process.

29.    The Company's Audit Committee is governed by the Audit Committee Charter, which provides that the purpose of the Audit Committee is to provide assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting, internal control and legal compliance functions of the Company and its subsidiaries.  This includes, without limitation, (a) assuming the Board's oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the Company's independent auditors' qualifications and independence and (iv) the performance of the Company's independent auditors and the Company's internal audit function, and (b) preparing the report required to be prepared by the Committee pursuant to the rules of the SEC for inclusion in the Company's annual proxy statement.

30.    Further, the Audit Committee Charter provides that the Audit Committee was responsible for the following in relevant part:

**Duties and Responsibilities of the Committee**

a.   Obtain and review at least annual the Company's internal audit plan, internal audit budget and risk management report;

b.   Select, in its sole discretion (subject to shareholder ratification) the firm of independent auditors to audit the books and accounts of the Company and its subsidiaries for each fiscal year, instruct the Company's independent auditors that they are ultimately accountable to the Committee and approve the independent auditors' annual engagement letter as well as all audit and … all permitted non-audit engagements and relationships between the Company and such auditors and pre-approve all audit and … permitted non-audit services to be performed by the independent auditors subject to such procedures as may be established by the Committee.

c.   Review the performance of the Company's independent auditors, including the lead partner of the independent auditors, and, in its sole discretion, make decisions regarding the replacement of termination of the independent auditors when circumstances warrant;

d.   Obtain and review at least annually the report of the independent auditors describing:

   i.   the independent auditors' internal quality-control procedures;

   ii.   any material issues raised by the most recent internal quality-control review, by a peer review or by any inquiry or investigation by any governmental or professional authority of the independent auditors, within the preceding five years, respecting one or more independent audits

20

carried out by the independent auditors, and any steps taken to deal with any such issues;

e.  Review the annual audit plan of the Company's independent auditors, including the scope of the audit, and monitor such plan's progress and results during the year;

f.  Review the results of the year-end audit of the Company by the independent auditors, including any significant matters regarding internal controls over financial reporting that have come to their attention during the conduct of the audit;

g.  Meet to review and discuss with management and the independent auditors the Company's annual audited financial statements and "Management's Discussion and Analysis disclosures, and recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K;

h.  Meet to review and discuss with management and the independent auditors, the Company's quarterly financial statements, Management's Discussion and Analysis and the results of independent auditor's review of the quarterly financial statements;

i.  Review with management, the Company's independent auditors' and the Vice President of the Company's internal auditing department, the following:

  i.  critical accounting policies and such other accounting policies of the Company as are deemed appropriate for review by the Committee prior to any interim or year-end filings with the SEC or other regulatory body, including any financial reporting issues which could have a material impact on the Company's financial statements;

ii.   any significant changes in the Company's selection or application of accounting principles;

iii.   alternative treatments of financial information that have been discussed by the independent auditors and management, ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the auditors;

iv.   all other material written communications between the independent auditors and management; and

v.   the effect of off-balance sheet structures on the financial statements of the Company;

j.   Review with the chief executive officer and chief financial officer and independent auditors, the following:

i.   *all significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data, including any material weaknesses in internal controls* identified by the Company's independent auditors;

ii.   *any fraud, whether or not material, that involved management or other employees who have a significant role in the Company's internal controls*; and

iii.   *any significant changes in internal controls over financial reporting*, including any corrective actions with regard to significant deficiencies and material weaknesses.

k.   Review:

      i.     ***the adequacy and effectiveness of the Company's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget and staffing of the Company's internal audit function***, through inquiry and discussions with the Company's internal auditors and management of the Company; and

      ii.    ***any required report prepared by management, and attested to by the Company's independent auditors, regarding the effectiveness of the Company's internal controls over financial reporting and stating management's responsibility to establish and maintain such internal controls***, prior to its inclusion in the Company's annual report;

l.    ***Review with management the Company's administrative, operational and accounting internal controls, including any special steps adopted in light of the discovery of material control deficiencies***, and evaluate whether the Company is operating in accordance with its prescribed policies, procedures and codes of conduct;

m.    Receive periodic reports from management to assess the impact on the Company of significant accounting or financial reporting developments that may have a bearing on the Company;

n.    Establish and maintain free and open means of communication between and among the Board, the Committee, the Company's independent auditors, the Company's internal auditing department and management, including providing such parties with appropriate opportunities to meet separate and privately with the Committee on a periodic basis;

o.    Discuss guidelines and policies governing the process by which senior management of the Company assess and manage the

Company's exposure to risk, as well as the Company's major financial risk exposures, including the Company's credit risk, liquidity risk, regulatory risk, operational risk and enterprise risk, and the steps management has taken to monitor and control such exposures;

p.     Meet regularly with the Company's internal auditors and the independent accountants to discuss the scope and plan for the internal audit and include management in its review of accounting and financial controls, assessment of business risks and legal and ethical compliance programs;

q.     Meet at least annually with the general counsel, and outside counsel when appropriate, to review legal and regulatory matters, including any matters that may have a material impact on the financial statements of the Company;

r.     Prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement;

s.     Review the Company's program to monitor compliance with the Company's Code of Conduct, and meet periodically with the Company's Chief Compliance Officer to discuss compliance with the Code of Conduct:

s.     Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls and auditing matters, and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

t.     Review, approval or ratification of transactions with related persons;

u.    Secure independent expert advice to the extent the Committee determines it to be appropriate, including retaining independent counsel, accountants, consultants or others, to assist the Committee in fulfilling its duties and responsibilities, the cost of such independent expert advisors to be borne by the Company;

v.    Conduct or authorize investigations into or studies of matters within the Committee's scope of responsibilities, and retain, at the Company's expense, such independent counsel or other advisers as it deems necessary;

w.    Review and approve or disapprove all proposed transactions with executive officers and directors that require Committee review in accordance with the Company's Code of Business Conduct and Ethics.  No member of the Committee having an interest in a transaction being reviewed shall participate in any decision regarding such transaction;

x.    Discuss significant, complex or unusual transactions with management and the independent auditor;

y.    Report regularly to the Board on its activities, as appropriate. In connection therewith, the Committee should review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors or the performance of the internal audit function;

(Emphasis added).

31.    Additionally, the Audit Committee is responsible for approving all related party transactions.  According to the 2013 Proxy and 2014 Proxy:

Related persons are required to obtain the approval of the Audit Committee of the Board of Directors for any transaction or situation that may pose a conflict of interest. In considering a transaction, the Audit Committee will consider all relevant factors including (i) whether the transaction is in the best interests of Ocwen; (ii) alternatives to the related person transaction; (iii) whether the transaction is on terms comparable to those available to third parties; (iv) the potential for the transaction to lead to an actual or apparent conflict of interest and any safeguards imposed to prevent such actual or apparent conflicts and (v) the overall fairness of the transaction to Ocwen. The Audit Committee will periodically monitor any approved transactions to ensure that there are no changed circumstances that would render it advisable for the Company to amend or terminate the transaction.

32.     Throughout the Relevant Period, Defendants Korn, Salcetti and Wish, as members of the Audit Committee, breached their fiduciary duties to Ocwen by: (i) failing to conduct oversight pertaining to the adequacy and the effectiveness of the Company's internal controls over public reporting of transactions and the Company's engagement in transactions, including mortgage-servicing practices that violated applicable regulations and laws; (ii) consciously disregarding their duties to monitor such controls over reporting and engagement in transactions; (iii) consciously disregarding their duties to ensure that they and other officers, directors and employees of Ocwen protected corporate assets, engaged in fair dealing, avoid using corporate opportunities for personal gain and avoid conflicts of interest; and (iv) causing the Company to misrepresent its financial results.

**Compliance Committee**

33.     Pursuant to the Company's 2013 and 2014 Proxy, the Compliance Committee "provides assistance to the Board of Directors with (i) establishment and oversight of our compliance function, including our compliance management system, and (ii) oversight of our compliance with applicable laws, rules and regulations governing its consumer-oriented businesses, including Federal consumer financial laws and applicable state laws."

34.     The Compliance Committee is governed by the Compliance Committee Charter, which states the following in relevant part:

> **Composition of the Committee**
>
> The Committee shall be comprised of three or more directors as determined from time to time by resolution of the Board.  The Committee shall consist of not less than a majority of independent directors as defined in the listing standards of the New York Stock Exchange, at least one of which independent directors shall have substantial experience in risk management, regulatory compliance, and/or compliance management.
>
> **DUTIES AND RESPONSIBILITIES OF THE COMMITTEE**
>
> a)     Review the status of the Company's compliance with Federal consumer financial laws, applicable state laws and internal policies, procedures and controls;

b)     Receive and oversee the assessment of internal and external data and reports relating to the Company's compliance programs;

c)     Oversee the activities of the Company's Compliance Management Committee, including review of internal data and reports prepared by the Compliance Management Committee;

d)     Receive periodic reports, no less than quarterly, from the Chief Compliance Officer and the Company's General Counsel regarding (i) pending or threatened government investigations, examinations, inquiries, demands or proceedings and material litigation, in each case which cover or would be expected to cover compliance with consumer financial laws and/or involve allegations of potentially unlawful, unfair or discriminatory acts and practices, (ii) details and factual information regarding any material claim or pattern of claims alleging that the Company is not in compliance with Federal consumer financial laws and/or applicable state laws or may be engaged in a pattern of unfair, deceptive, abusive, discriminatory acts of practices and (iii) regulatory developments relevant to the Company's business;

e)     Review and approve, at least annually, the Company's formal written compliance plan and policy statements and directives related to compliance with applicable Federal consumer financial laws and applicable state laws;

f)     Review new consumer financial products or services or Company strategies, to determine degree of compliance function participation (including consideration of fair lending or antidiscrimination laws);

g)     Oversee the resourcing of compliance functions at the Company, including staffing, systems and monitoring;

h)    Oversee the formulation and implementation of the Company's compliance management system, consisting of four interdependent control components, (i) Board and management oversight, (ii) written compliance program, (iii) response to consumer complaints, and (iv) compliance audit function;

i)    Periodically review the Company's consumer complaint intake and resolution function, in light of risk of violation of state laws and Federal consumer financial laws and related risks to consumers;

j)    Request reports from the Chief Compliance Officer, the Company's General Counsel and management regarding the preparation, implementation and updating of the Company's compliance policies, procedures, training and controls;

k)    Ensure that the full Board receives reports and materials as necessary from time to time regarding significant compliance issues.

**Evaluation of the Committee**

The Committee shall, on an annual basis, evaluate its performance under this Charter.  In conducting its review, this Committee shall evaluate whether this Charter appropriately addresses the matters that are or should be within its scope.  The Committee shall address all matters that the Committee considers relevant to its performance, including at least the following: the adequacy, appropriateness and quality of the information and recommendations presented by the Committee to the Board, the manner in which they were discussed or debated, and whether the number and length of meetings of the Committee were adequate for the Committee to complete its work in a thorough and thoughtful manner.  The Compliance Committee is required to deliver to the Board a report setting forth the results of its annual evaluation, including any recommended changes to the Company's or the Board's policies or practices.

35.     During the Relevant Period, Defendants Salcetti, Ross and Faris served on the Board's Compliance Committee.  Additionally, the 2014 Proxy states that Defendant Faris is the Company's President and CEO and is a member of the Compliance Committee because "we believe the Compliance Committee benefits from his deep knowledge of industry regulation and compliance practices as well as his many years of experience working with industry regulators."

36.     The Compliance Committee Defendants, directly and/or through subordinates, blatantly violated the Company's Compliance Policy by, *inter alia*, participating and/or acquiescing in the wrongdoing and/or failing to have in place adequate internal controls and oversight to prevent the widespread wrongdoing and violation of state and federal consumer financial protection and securities laws and regulations and other wrongdoing as outlined herein, which was systemic and ongoing, all of which has caused Ocwen billions of dollars in damages to date and is subjecting it to further damages, fines and penalties. That the Compliance Committee Defendants failed to fulfill their responsibilities is evidenced by the recent settlement with the New York Department of Financial Services ("NY DFS") on December 22, 2014 pursuant to which the Company effectively acknowledged their systemic and widespread regulatory failings, as described herein.

37.    As noted in the Company's latest Proxy Statement:

**Risk Management and Oversight Process**

Our Board of Directors and each of its Committees are involved in
overseeing risk associated with the Company. The Board of Directors
and the Audit Committee monitor Ocwen's credit risk, liquidity risk,
regulatory risk, operational risk and enterprise risk by regular reviews
with management and internal and external auditors. In its periodic
meetings with the internal auditors and the independent accountants,
the Audit Committee discusses the scope and plan for the internal
audit and includes management in its review of accounting and
financial controls, assessment of business risks and legal and ethical
compliance programs. The Board of Directors and the
Nomination/Governance Committee monitor the Company's
governance and succession risk by regular review with management.
The Board of Directors and the Compensation Committee monitor the
Company's compensation policies and related risks by regular reviews
with management. The Board of Directors and the Compliance
Committee monitor the Company's regulatory compliance and related
risks by regular reviews with management. The Board of Directors'
role in risk oversight is consistent with the Company's leadership
structure with the President and Chief Executive Officer and other
members of senior management, such as our Chief Risk Officer and
our Chief Compliance Officer, having responsibility for assessing and
managing the Company's risk exposure, and the Executive Chairman,
the Board of Directors and its Committees providing oversight in
connection with these efforts.

## SUBSTANTIVE ALLEGATIONS

### Home Mortgage Servicing Industry

38.     The single family home mortgage servicing industry consists of three players: (1) borrowers who obtain mortgages for one to four-family residential properties; (2) the trusts and investors who own borrowers' mortgages and derive income from borrowers' principal and interest payments; and (3) mortgage servicers that collect borrowers' mortgage payments, pass the principal and interest on to the owner and profit from the fees for ancillary services.

39.     For more than thirty years, mortgages typically have been "pooled" to create an investment vehicle, often denominated as a trust.  Interests in the trust have been sold to investors that own interests in payment streams generated by principal and interest payments by the borrowers.  These interests are called mortgage backed securities.

40.     A mortgage servicer, such as Ocwen, is a company to which borrowers pay their mortgage loan payments and which performs other services in connection with mortgages and mortgage-backed securities.  Mortgage servicers perform the following services: collecting payments from borrowers, applying the payments as provided by the mortgage agreement, forwarding principal and interest to the

owner, assessing and collecting money for any distressed mortgage services as provided by the mortgage contract for such things as late payments, property inspection fees, appraisal fees, foreclosure auctions and title examinations, managing any escrow created for the payment of taxes and/or insurance, and default and delinquency related activities such as pursuing collections or foreclosing on borrowers' homes.

41.     Often, the servicer did not originate the loans it services but became the servicer by purchasing the "mortgage servicing rights" or by entering into a contract with a "master servicer" to act on its behalf as a "subservicer." This occurs at various times throughout the life of the mortgage, including when the borrower is delinquent in payments and may be seeking the servicer's assistance to avoid foreclosure.

42.     Under these servicing agreements, the servicer collects the borrower's payments for principal and interest and passes them along to the owner. In contrast, the servicer collects the borrower's payments for ancillary costs (such as distressed mortgage fees) and retains this fee for itself. Thus, every dollar a borrower pays in fees (as opposed to principal and interest) is a dollar of revenue for the servicer. This arrangement is fraught with peril because a company such as Ocwen has a

perverse incentive to have borrowers become delinquent, thus maximizing fees for itself, including fees resulting from distressed mortgages.

43.     For loan servicers like Ocwen which are driven by greed and the desire to maximize profit from servicing loans, the right to charge servicing fees is ripe for abuse.  Because the money Ocwen can generate from servicing fees is not linked to money generated from principal and interest, Ocwen makes more money on defaulting mortgages.  In other words, Ocwen is incentivized to grow its profits by finding ways to charge borrowers additional fees, and distressed borrowers are the perfect candidates to help Owen accomplish this illicit goal.

### Background of Ocwen

44.     Ocwen is a financial services holding company which, through its subsidiaries, is engaged in the servicing and origination of mortgage loans.  Ocwen, headquartered in Atlanta, Georgia, is a Florida corporation organized in February 1988.  Ocwen is the fourth largest non-bank mortgage servicer of subprime loans in the United States and with its predecessors has been servicing residential mortgage loans since 1988 and subprime mortgage loans since 1994.  Ocwen Loan Servicing, LLC ("OLS") is an indirect wholly owned subsidiary of Ocwen, and is licensed to

service mortgage loans in all 50 states, the District of Columbia and two U.S. territories.

45.   Ocwen's predecessor, The Oxford Financial Group, was founded in 1983 by defendant Wish, who was soon joined by defendant Erbey, and together they founded Ocwen and took the Company public in 1996.  By 1999, Ocwen had largely stopped making loans to people with poor credit, focusing instead on servicing these loans, positioning the Company to reap profits in the aftermath of the 2008 housing collapse from the millions of delinquent and underwater borrowers.

46.   Ocwen has been originating forward mortgage loans since 2012 and reverse mortgage loans since mid-2013.  Subprime loans are those offered at a higher interest rate to individuals who do not qualify for traditional "prime" loans. Such subprime loans are often given by nontraditional lenders to persons with low credit ratings or other factors indicating that they have a higher probability than the typical borrower of defaulting on the debt repayment.  Subprime loans are given to individuals who do not qualify for better loans because of their risk factors, so subprime loans are more likely to become distressed because a borrower falls

behind on their payments.  Once again, there is a greater opportunity for Ocwen to collect fees and increase profits from servicing subprime as opposed to prime loans.

47.    The Company has two lines of business: lending and servicing.  In Ocwen's lending business, the Company originates and purchases conventional and government insured forward mortgage loans through the direct, wholesale and correspondent lending channels of the Company's Homeward operations.  Ocwen also originates and purchases Home Equity Conversion Mortgages insured by Federal Housing Administration ("FHA") through Ocwen's Liberty[1] operations.

48.    Ocwen's servicing business is primarily comprised of its core residential mortgage servicing business and currently accounts for the majority of Ocwen's total revenue.   Servicing involves the collection and remittance of principal and interest payments received from borrowers, the administration of mortgage escrow accounts, the collection of insurance claims, the management of loans that are delinquent or in foreclosure or bankruptcy, including making servicing advances, evaluating loans for modification and other loss mitigation activities and, if necessary, foreclosure referrals and the sale of the underlying

---

[1] In April 2013, Home Equity Solutions, Inc. ("Liberty") became a subsidiary of Ocwen.  Liberty offers reverse mortgages through direct, wholesale and correspondent channels.

mortgaged properly following foreclose on behalf of investors or other servicers. Ocwen earns contractual monthly servicing fees pursuant to servicing agreements, as well as other ancillary fees in connection with owned mortgage servicing rights ("MSRs"). Ocwen also earns fees under both subservicing and special servicing arrangements with banks and other institutions that own the MSRs.

49. As a mortgage servicer, Ocwen is supposed to assist delinquent borrowers in reworking their loan payments in order to avoid foreclosure. According to Ocwen's website, the Company states that it "cures more loans and keeps more borrowers current than anyone in the industry," allowing it to "achieve[] pre-foreclosure resolution rates of 70% or more." Ocwen portrays itself as "widely recognized in the national media and by consumer advocacy groups as the industry leader in responsible home retention through foreclosure prevention" and claims "exceptional performance" that is the result of its "state-of-the-art proprietary servicing systems." Ocwen claims it "modifies loans at rates far above industry norms," stating its "re-default rates are among the lowest."

50. Under the mortgage servicing rights that Ocwen acquires, Ocwen has the unilateral right to assess late fees and other default or delinquency charges provided for in the mortgage agreement. Ocwen servicing exercises full discretion

to charge late fees and other default and delinquency charges, and collects such charges and fees from borrowers pursuant to the terms of borrowers' mortgage contracts.

51.     When Ocwen exercises its discretion to assess late fees, default or delinquency charges, Ocwen advances the money to pay said fees, charges or premiums, and retains the right to recover the amounts advanced from borrowers. Ocwen then adds these amounts to borrowers' loans to collect the amounts advanced.  For example, when Ocwen performs a distressed loan service such as a property inspection, Ocwen pays a third party for the service then adds the cost on to the borrower's bill.

52.     The amount of revenue Ocwen earns from its servicing business is a function of the unpaid principal balance ("UPB") of the loans it services.  Ocwen typically earns fees for its servicing operations as a percentage of UPB for its servicing and subservicing arrangements.

53.     The UPB of Ocwen's servicing portfolio increases when the Company obtains the right to service or subservice additional mortgages.  Conversely, UPB is reduced when homeowners make normal principal payments.

54.     Because Ocwen earns servicing fees as a percentage of the UPB of its MSRs and/or subservicing arrangements, increasing the size of Ocwen's portfolio of MSRs and/or subservicing arrangements was critical to growing the Company's revenues during the Relevant Period.    Further, because UPB declines as homeowners make principal payments on their mortgages, some amount of growth in the size of its servicing portfolio is necessary to prevent Ocwen's revenues from declining.   Thus, Ocwen's continued financial success is dependent on the growth of its servicing portfolio, a fact which the Company has acknowledged in its various SEC filings.

**Ocwen's Spin-Offs**

55.     Following the 2008 financial crisis and housing collapse, mortgage foreclosure rates in the United States rose to the highest levels since the Great Depression.  The Company saw this as a great opportunity to exploit the depressed market and increase profits, and as a result, beginning in 2009, Ocwen, under the direction of defendant Erbey, commenced the first of what would eventually be four spin-offs of Ocwen: Altisource, Residential, AAMC and HLSS (collectively referred to as the "Ocwen Affiliates").

56.    Defendants Erbey and Wish continue to hold equity in the Ocwen Affiliates.  Notably, Erbey is the largest shareholder in each of the four spin-offs and the former chairman of the boards of all five of the publicly traded companies. [2] As a result, Erbey and Wish, among others, have conflicting obligations to Ocwen and each of the Ocwen Affiliates, all of which continue to derive significant revenues and earnings in large part from their ongoing and substantial, but conflicted, business dealings with Ocwen.

*Altisource*

57.    Prior to August 2009, Ocwen's mortgage servicing systems were provided by a subsidiary of Ocwen called Ocwen Solutions.  Ocwen Solutions' mortgage servicing systems provided technological services throughout the lifecycle of the mortgages serviced by Ocwen – including triggering the distressed mortgage services and the resulting fees at issue in this case – and also including collections and customer relationship management.  Ocwen developed these mortgage servicing systems over a period of more than 20 years at a cost of more than $150 million.

_____

[2] Defendant Erbey resigned as Chairman of the board of directors of these affiliated companies on January 16, 2015.

58.     On August 10, 2009, Ocwen, under the direction of Defendant Erbey, spun off its "Ocwen Solutions" line of business into Altisource, a separate publicly traded company.   Following Altisource's separation from Ocwen, the two companies entered into several long-term agreements that allow Altisource to profit from Ocwen's determination to foreclose on a mortgage.   As of December 31, 2013, Defendant Erbey owned or controlled 26% of Altisource's common stock.

59.     The majority of Altisource's revenue is derived from services it provides to Ocwen.  Altisource's principal revenue source is mortgage servicing technologies, in essence, mortgage servicing computer applications, that are leased by Ocwen.  According to Altisource, "Ocwen purchases certain mortgage services and technology services from us under the terms of the master services agreements and amendments to the master services agreements," which extend into 2025.  As Altisource CEO Bill Shepro stated during Ocwen's December 2013 Conference, under this agreement, Altisource is "the provider of all the services that Ocwen would typically 'outsource' to third-party service providers."

60.     Altisource was also created for tax-saving purposes and is incorporated in Luxembourg.  Altisource CEO Bill Shepro stated during Ocwen's December 2013 Conference that the spin-off of Altisource from Ocwen and its incorporation

in Luxembourg "helped us all lower our global effective tax rate, which for 2013 has been at 6%, and that was done through our location of a headquarters in Luxembourg."

61.   Altisource provides its REALServicing platform to Ocwen, which Ocwen uses to determine whether resolving non-performing loans through modification, deed-in-lieu of foreclosure or foreclosure will optimize its net present value.

62.   When Ocwen determines, through its use of Altisource's REALServicing platform, to foreclose on a loan, Altisource steps in to provide an array of foreclosure related services, including asset management, insurance services, residential property valuation, default management services, and origination management services.   Altisource's asset management operations involve services such as Real Estate Owned ("REO") asset management, title insurance, property preservation, and operation of the Hubzu consumer real estate portal.

63.   Hubzu, owned by Altisource, is an online auction site for the sale of homes facing foreclosure and investor-owned properties following foreclosure.  A substantial portion of Ocwen's REO and short-sale properties are marketed on

Hubzu, and the vast majority of Hubzu listings are Ocwen-serviced properties. Additionally, Ocwen uses a real estate agent employed by Altisource subsidiary REALHome Services and Solutions, Inc., to act as the seller's agent for many of its listings on Hubzu.

64.    Indeed, as set forth in Altisource's 2013 Form 10-K and Altisource's quarterly report filed with the SEC on Form 10-Q for the period ended September 30, 2014, Altisource reported that it earned 65% and 60% of its revenue, respectively, from Ocwen.

65.    Thus, it would appear that Ocwen spent the time and money to develop all the services provided by Altisource, only to then turn around and give all that proprietary information to Altisource for Erbey to profit from.

***HLSS***

66.    In 2010, Ocwen spun off HLSS, another publicly traded company created to acquire MSRs and related servicing advances, loans held for investments and other residential mortgage related assets.  HLSS primarily acquires MSRs from Ocwen and then contracts with Ocwen to service the loans.

67.    As set forth in the Company's 2013 Form 10-K, between March 5, 2012 and December 31, 2015, Ocwen sold to HLSS the rights to MSRs and related servicing advances for loans with a UPB of $202.3 billion.

68.    Additionally, Ocwen and HLSS have agreed to provide each other with professional services, including valuation analysis of potential MSR acquisitions, treasury management services . . . legal licensing and regulatory compliance support services, risk management services and other similar services."

### Residential

69.    On December 21, 2012, Altisource completed the spin-off of wholly-owned subsidiary Residential into a separate publicly traded company.

70.    Residential is focused on acquiring and managing single family rental properties by acquiring portfolios of sub-performing and non-performing residential mortgage loans throughout the United States.

71.    Pursuant to Residential's 2013 Form 10-K filed with the SEC, Altisource contributed $100 million of equity to Residential in exchange for shares that were distributed to Altisource shareholders.

72.    As with Altisource, Residential remains inextricably linked with Ocwen.  It has few if any of its own employees.  Similar to Altisource and Ocwen's

44

relationship, Residential also entered into a Support Services Agreement with Altisource, whereby Altisource could provide human resources, vendor management operations, corporate services, risk management services, quality assurance services, treasury, finance accounting, legal, tax and compliance services. Moreover, it entered into long-term master service agreements with Ocwen and Altisource on December 21, 2012, whereby Residential provides property management, leasing and construction management services associated with the acquired single-family rental assets following foreclosure.

73.    Additionally, as set forth in the Company's 2013 Form 10-K, Ocwen entered into a 15-year servicing agreement with Residential's operating partnership, Altisource Residential, L.P.  Pursuant to this agreement, Ocwen agreed to service residential mortgage loans acquired by Residential and provide loan modification, assisted deed-in-lieu of foreclosure, assisted deed-for-lease and other loss mitigation programs.

74.    According to its quarterly report filed with the SEC on Form 10-Q for the third quarter of 2014, as of September 30, 2014, Residential's portfolio consisted of 12,090 mortgage loans, substantially all of which were non-performing, with an aggregate UPB of $3.2 billion and market value of underlying

properties of $2.9 billion.  It also owned 2,984 REO properties valued at $460.1 million, 2,660 were held for use and 324 were held for sale.  It also owned 872 re-performing mortgage loans with a UPB of $204.3 million and property value of $267.7 million.

### AAMC

75.    On December 31, 2012, Altisource completed the spin-off of wholly-owned subsidiary AAMC into a separate publicly traded company.

76.    AAMC is an asset management company providing portfolio management and corporate governance services to Residential.

77.    AAMC serves as Residential's asset manager.    Under its asset management agreement with Residential, AAMC performs Residential's day-to-day operations, defines investment criteria, executes asset acquisitions for Residential, analyzes property sales, oversees Ocwen's servicing of Residential's loans, oversees Altisource's renovation, leasing and property management of Residential's properties, and performs asset management and corporate governance duties.

78.    According to Ocwen's 2013 Form 10-K, on December 31, 2013, the Company entered into a support services agreement with AAMC, whereby Ocwen

agreed to provide business development, analytical and consulting and administrative services to AAMC.

79.   These spin-off companies, which do business with each other and with Ocwen, were purportedly created to provide technology and perform various services for Ocwen, including management of its foreclosed properties, while appearing, on the surface, to be separate and independent entities from Ocwen.

80.   Despite the Individual Defendants' statements that the four spin-offs had sound corporate governance with separate boards and management, and that Ocwen maintained a "'strictly arms-length business relationship with "[the four spin-off] companies," in actuality, because of the overlapping ownership, control and management of Ocwen and the other four entities, Defendants Erbey and Wish, on the Individual Defendants' watch, were siphoning off revenues from Ocwen to the four related spin-off companies for services that were illicitly raising costs for the mortgagees whose loans Ocwen was supposedly servicing, thereby exposing Ocwen and its shareholders to billions of dollars in regulatory and civil liability. Meanwhile, in direct breach of their fiduciary duties and Company policies, defendants Erbey and Wish personally benefited because they largely owned the four spin-off companies which profited from the improper fees charged to Ocwen.

81.     As Christopher Wyatt, a housing consultant and former Vice President at Goldman Sachs' Litton Loan Servicing LP ("Litton"), would later articulate, Ocwen's attitude was the "[i]f a mortgage goes into foreclosure and you lose those servicing fees, so what, [y]ou can funnel it to one of your other businesses and still make money from it."

**After the 2008 Housing Crisis, Ocwen Capitalizes on Increased Regulatory Scrutiny of Mortgage Servicers**

82.     Following the 2008 housing crisis, the mortgage servicing industry was subjected to extensive regulation by state, federal and local governments, along with federal agencies, such as the Consumer Financial Protection Bureau ("CFPB"), the Federal Trade Commission ("FTC") and the SEC.  As a result, servicers like Ocwen are required to comply with a number of consumer protection laws.

83.     This increased regulatory scrutiny of mortgage servicers was necessitated by the widespread, abusive and predatory practices employed by servicers throughout the housing crisis.  These predatory practices included, among other things, "robo-signing," which involved mortgage servicers signing affidavits of foreclosure without verifying whether the information was in fact true and correct.

84.     In an effort to curb such abusive practices and protect homeowners, in February 2012, 49 states and the District of Columbia entered into a $25 billion settlement with five banks: Ally Bank (formerly GMAC), Bank of America, Citicorp, JP Morgan Chase and Wells Fargo, five of the nation's biggest mortgage lenders, over a myriad of improprieties, ranging from the "robo-signing" of foreclosure documents to failing to negotiate in good faith with homeowners over inflated fees and other charges that pushed them into default (the "National Mortgage Settlement").  The National Mortgage Settlement encouraged lenders to negotiate lower rates with existing borrowers and to lower principal amounts owed in an effort to lower foreclosure rates. Specifically, under the new servicing rules the signing banks were prohibited from employing "robo-signing" in foreclosures and paying agents to speed up foreclosures.  In addition, new detailed paperwork obligations were implemented, as well as other steps before the initiation of foreclosure proceedings, including reviewing any loan modification proposals the borrower made and giving borrowers two weeks to accept or reject any modification proposal.  Separately, banks also faced regulations limiting the amount of capital they could risk on servicing rights, leading them to offload their servicing businesses.

85.    Because Ocwen was not a party to the National Mortgage Settlement and was not subject to the capital rules levied on the banks and its principal officers, the Individual Defendants saw an opportunity to capitalize on the increased regulatory scrutiny of subprime mortgage servicers by aggressively acquiring assets from larger banks that were anxious to dump their mortgage servicing units.

86.    Ocwen and the Ocwen Affiliates profited over the years by buying high-risk mortgages from banks and then extending additional high interest rate loans to already indebted and cash-strapped homeowners.  Although the Individual Defendants knew that the Company and the Ocwen Affiliates were under heightened scrutiny from regulators for years for their allegedly abusive practices, the large-scale MSR offloading by large banks and other entities resulting from the National Mortgage Settlement further incentivized the Individual Defendants' misconduct by making Ocwen and the Ocwen Affiliates exponentially more profitable.

**Increased Regulatory Scrutiny Does Nothing to Curtail Ocwen's Abusive Practices and Rapid Growth**

87.    In the aftermath of the housing crisis throughout the United States and in light of Ocwen's rapidly expanding portfolio, the NY DFS, through its

Superintendent, Benjamin Lawsky ("Superintendent Lawsky") began investigating Ocwen concerning allegedly abusive practices toward homeowners.

88.   On June 5, 2011, Ocwen announced its agreement with Goldman Sachs to purchase a lending mortgage servicer, Litton Loan Services LP ("Litton"), an acquisition that would increase Ocwen's servicing portfolio by over $38 billion, or more than 53% of the total UPB of Ocwen's servicing portfolio as of March 31, 2011.

89.   On August 24, 2011, Ocwen asked the NY DFS to approve the Litton acquisition.  However, the NY DFS had serious concerns about whether Ocwen would be able to effectively handle the increased servicing volume while at the same time, comply with Home Affordable Modification Program ("HAMP") requirements, internal loss mitigation policies and procedures, and laws and regulations governing mortgage loan servicing and foreclosure activities. Therefore, the NY DFS conditioned its approval of the Litton transaction on the entry into an Agreement on Mortgage Servicing Practices ("MSP Agreement") that governed certain mortgage servicing practices.  According to the agreement, NY DFS sought to ensure that Ocwen "has sufficient capacity to properly board and manage a significant portfolio of stressed loans," and to alleviate "consumer

51

protection concerns relating to practices highlighted in the media that have been prevalent in the mortgage servicing industry generally." Ocwen agreed to more than sixty specific requirements, including: (1) establishing and maintaining sufficient capacity to properly manage its significant portfolio of distressed loans; (2) engaging in sound document execution and retention practices to ensure that mortgage files were accurate, complete and reliable; and (3) implementing a system of robust internal controls and oversight with respect to mortgage servicing practices performed by its staff and third-party vendors.

90.     In conditioning the Litton acquisition upon Ocwen's execution of the MSP Agreement, the NY DFS confirmed its authority to halt Ocwen's exponential growth if it determined that Ocwen was not acting in the best interests of homeowners.

91.     Soon after Ocwen closed on the Litton acquisition (and following its entry into the MSP Agreement), the Company announced on October 24, 2011, that it had entered into a purchase agreement with Morgan Stanley to acquire Morgan Stanley's Saxon unit which contained MSR assets.

92.     Ocwen continued its buying spree and disclosed on November 9, 2011 in its quarterly report filed with the SEC on Form 10-Q for the period ended

September 30, 2011 that it had entered into an agreement with JPMorgan Chase to purchase MSRs for approximately 82,000 non-prime mortgage loans with a UPB of approximately $15 billion, or 14% of the total UPB of Ocwen's servicing portfolio as of September 30, 2011.

93.     On December 15, 2011, the MSP Agreement was amended ("MSP Amendment") to prevent Ocwen from, among other things, charging borrowers penalties, fees, costs and interest as a result of delays in court appearances caused by the closure of the law firm of Steven J. Baum, one of Ocwen's New York foreclosure counsel, following widespread allegations of improper foreclosure practices by the firm.   Speaking about the MSP Agreement and the MSP Amendment, Superintendent Lawsky stated that it "sets a new higher standard for the residential mortgage servicing industry, whose troubling foreclosure and servicing practices we have been investigating along with other regulators across the country."

94.     Less than two months later, on May 23, 2012, the Company announced that it had entered into an agreement with Bank of America, National Association ("BANA") to purchase MSRs with respect to approximately

53,100 mortgage loans owned by a government-sponsored enterprise ("GSE") with an aggregate UPB of approximately $10.7 billion.

## Under the Individual Defendants' Watch, Ocwen Fails to Comply With the MSP Agreement

95.     On June 13, 2012, following complaints about Ocwen's servicing practices, the NY DFS paid surprise visits to Ocwen's offices in Houston, Texas and West Palm Beach, Florida, to ensure that Ocwen was complying with the MSP Agreement. The examination preliminarily identified gaps in the servicing records of certain loans and indicated Ocwen's non-compliance with the MSP Agreement, including in some instances, (1) failing to provide certain borrowers direct contact information for their designated loss mitigation staff or a single point of contact ("SPOC"); (2) pursuing foreclosure actions against certain borrowers who are seeking a loan modification (referred to in the Agreement as "dual tracking"); (3) failing to conduct an independent review of certain loan modification denials; (4) failing to demonstrate its adoption of policies and procedures to effectively track sanctioned third-party vendors, including local foreclosure counsel; (5) failing to demonstrate its implementation of policies and procedures to verify borrower information on newly boarded accounts to accurately reflect the status and current

balance of the borrower's account; and (6) failing to sufficiently document actions required to ensure that prior modification efforts are not rendered futile upon transfer of a servicing file to or from Ocwen.

96.    However, the negative results of the NY DFS investigation did nothing to temper the Individual Defendants' greed.  Despite the scathing result of the NY DFS examination, in October 2012, Ocwen announced two additional transactions which would continue to expand the Company's servicing portfolio.  On October 3, 2012, Ocwen announced that it would be purchasing Homeward Residential Holdings, Inc. ("Homeward"), including its various residential mortgage loan servicing and origination operating subsidiaries and Residential Capital LLC's ("ResCap") loan servicing platform. The purchase of ResCap alone would increase Ocwen's portfolio by over $370 billion in UPB.

97.    The market reacted favorably to the purchase of ResCap.   On December 7, 2012, *The Wall Street Journal* reported that Ocwen's pending ResCap deal, which was expected to close in the first quarter of 2013, positioned the Company to become the fifth-largest subprime mortgage servicer in the United States.  In addition, the article noted that Ocwen's rapid expansion rendered the Company a "stock market darling" and "favorite among investors," as its common

55

stock was trading around $35.50 per share – an increase of over 250% over the past two years.

98.     Despite the market's enthusiasm, it became clear to Superintendent Lawsky that the MSP Agreement had little to no effect on curtailing Ocwen's abusive servicing practices.  Thus, Superintendent Lawsky went one step further, seeking to put a monitor in place in connection with New York mortgages being serviced by Ocwen.  On December 5, 2012, in an effort to quell criticism and close the deal on the Homeward acquisition, Ocwen's loan servicing unit complied with Superintendent Lawsky's request and entered into a consent order with the NY DFS, agreeing to the appointment of a monitor within 20 days "who [would] report directly to the Department and conduct a comprehensive review" of Ocwen's loan servicing operations in New York, representing approximately 40,000 loans (the "Consent Order").

99.     The Consent Order stated that a June 2012 examination of Ocwen had indicated "non-compliance by Ocwen" with a previous regulatory agreement, including the failure to send 90-day notices in "some instances" before commencing foreclosure actions, and commencing foreclosure actions without proper documentation, along with other violations.  The compliance monitor would serve

for 24 months to "identify needed corrective measures to address identified weaknesses and deficiencies in Ocwen's servicing practices, make recommendations to the Superintendent, and oversee their implementation as approved by the Superintendent." In essence, the Consent Order was designed to subject Ocwen to rules and oversight similar to that of the big banks. The NY DFS's Monitor, Joseph Smith, began his oversight of the Company's operations in 2013. However, despite the presence of Mr. Smith, the Individual Defendants never implemented any corrective measures to ensure compliance with the NY DFS' regulations.

100.  By entering into the Consent Order, Ocwen was able to proceed with closing on the Homeward acquisition in December 2012. As a result, Ocwen managed to almost double the UPB of its residential servicing portfolio (an increase of 99.3% during fiscal year 2012) from $102.2 billion to $203.7 billion. Over the same period, the Company's total revenue increased by 70.4%, and its share price rose 139%, from $14.48 per share on December 30, 2011 to $34.59 per share on December 31, 2012.

101.  On February 28, 2013, Ocwen announced its financial results for the fourth quarter and full year 2012 in a press release. During conference call with

analysts and investors that took place that same day, despite knowing that Ocwen was not complying with NY DFS regulations, Defendant Faris reassured investors and stated "We continue to cooperate with the New York State Department of Financial Services to ensure compliance with the servicing standards agreement we signed in 2011."

102.   On March 1, 2013, the Company filed its Form 10-K with the SEC (the "2012 Form 10-K"), which included a description of the relationships between Ocwen and its affiliated companies.   After warning that Defendant Erbey (along with other officers and directors) had obligations to Ocwen as well as to Altisource due to his position as Chairman of Altisource and his significant ownership of Altisource common stock, the Company assured shareholders by representing that it has taken appropriate steps to ensure that a conflict does not in fact arise:

> We have adopted policies, procedures and practices to avoid potential conflicts involving significant transactions with related parties such as Altisource, including Mr. Erbey's recusal from negotiations regarding and credit committee and board approvals of such transactions.  We will also seek to manage those potential conflicts through dispute resolution and other provisions of our agreements with Altisource and through oversight by independent members of our Board of Directors.

103.   The 2012 Form 10-K also included by reference the discussion of the section entitled "Business Relationships and Related Transactions" from the 2013

Proxy Statement, which was filed with the SEC on April 3, 2013.  The 2013 Proxy Statement stated, in relevant part, that "Due to the nature of Mr. Erbey's obligations to each of the companies [Altisource, Residential, AAMC, and HLSS], he recuses himself from decisions pertaining to any related transactions.

104.   The 2012 Form 10-K also discussed the relationship between Ocwen and Altisource, and stated in relevant part:

> For purposes of governing certain of the ongoing relationships between Ocwen and Altisource after the Separation, and to provide for an orderly transition to the status of two independent companies, we entered into certain agreements with Altisource.
>
> *Certain services provided by Altisource under these contracts are charged to the borrower and/or loan investor.*  Accordingly, such services, while derived from our loan servicing portfolio, are not reported as expenses by Ocwen.  These services include residential property valuation, residential property preservation and inspection services, title services and real estate sales.
>
> Our business is currently dependent on many of the services and products provided under these long term contracts which are effective for up to eight years with renewal rights.  *We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.*  (Emphasis added).

59

105.  The 2012 Form 10-K also discussed the Consent Order, and the Company assured shareholders that it would comply with the regulatory investigations:

> Separately, on December 5, 2012, we entered into a Consent Order with the NY DFS in which we agreed to the appointment of a Monitor to oversee our compliance with the Agreement on Servicing Practice. A process is underway with respect to the selection and appointment of a Monitor by the NY DFS, and we intend to continue to cooperate with respect thereto…we are cooperating with and providing requested information to each of the agencies involved in the foregoing actions.

106.  The 2012 Form 10-K was signed by defendants Erbey, Faris, Korn, Lacy, Salcetti, Wish and Britti, and reiterated the Company's previously announced financial results and financial positions.  In addition, the 2012 Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Faris and Britti stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

107.  In the SOX Certifications accompanying the 2012 Form 10-K, Defendants Faris and Britti each certified that they are "responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act

Rules 13a-15(e) and 15d-15(e) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant to have:

a. "Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;"

b. "Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;" [and]

c. "Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation."

108.   As set forth in more detail below, the Individual Defendants not only continued their pattern of lying to investors by concealing the fact that they never intended to comply with the Consent Order, but their abusive practices intensified, thus causing the Company to incur billions of dollars in regulatory fines, penalties and civil liability.

## The Individual Defendants Cause Ocwen to Issue False and Misleading Statements

109.   The Individual Defendants breached their fiduciary duties by causing and/or allowing Ocwen to issue public statements, which did not accurately portray Ocwen's true financial performance and condition.

110.   The Individual Defendants caused Ocwen to continue to report record financial results and forecast strong revenues and earnings, touting its purported ability to run a lean operation and cut costs, partly by outsourcing work to India and using technology to cure defaults and avoid foreclosures, while claiming that their primary focus is to avoid foreclosures and help keep families in their homes. Concurrently, the Individual Defendants concealed from Ocwen shareholders and the investing public that, *inter alia*, the agreed-upon terms and conditions of the Consent Order were being ignored and that the Company was continuing its abuses

of those who had mortgaged their homes. By acting in such manner, the Individual Defendants breached their fiduciary duties to stockholders and exposed Ocwen to substantial liability from those who purchased the Company's securities.

111. Specifically, the Individual Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing or should have known that they were causing or allowing the Company to conceal from its shareholders that its financial statements for 2013 and the first quarter of 2014 contained significant errors and could not be relied upon. The Individual Defendants also either knew, consciously disregarded, were reckless and grossly negligent in not knowing or should have known that they were causing or allowing the Company to have material weakness in its internal controls over financial reporting and caused or allowed the Company to conceal the material weakness from shareholders. This material weakness in internal controls over financial reporting was the cause of the errors in the financial statements for the periods spanning from the first quarter of 2013 through the first quarter of 2014, and caused the Company to restate its financial statements for the foregoing periods.

112. During the Relevant Period, the Individual Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing or

should have known that they were causing the Company to issue false and misleading statements about the Company. In breach of their fiduciary duties of good faith and loyalty, and with respect to the members of the Audit Committee (Defendants Korn, Salcetti and Wish), their fiduciary responsibilities as members of the Audit Committee, these Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing the obvious and pervasive problems with the Company's financial statements, accounting practices, and its complete absence of adequate internal and financial controls, and failed to make a good faith effort to correct the problems or prevent their recurrence.

113. With respect to the members of the Compliance Committee (Defendants Wish, Faris and Salcetti), these Defendants directly and/or through subordinates, blatantly violated the Company's Compliance Policy by, *inter alia*, participating and/or acquiescing in the wrongdoing and/or failing to have in place adequate internal controls and oversight to prevent the widespread wrongdoing and violation of state and federal consumer financial protection and securities laws and regulations and other wrongdoing as outlined herein, which was systemic and ongoing, all of which has caused Ocwen billions of dollars in damages to date and is subjecting it to further damages, fines, and penalties.

114.   As a result of the materially false and misleading statements and the lack of internal controls, the Individual Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing or should have known that they caused or allowed the Company to falsely inflate Ocwen's stock price and as a result have subjected Ocwen to the Securities Class Action and regulatory investigations, from which it has, and will continue to incur, costs and expenses in order to defend itself.

**Ocwen's False and Misleading Statements and the Reasons for their Falsity**

115.   Throughout the Relevant Period, the Individual Defendants' public statements repeatedly summarized defendant Erbey's ownership in the Ocwen Affiliates and falsely misrepresented that defendant Erbey recused himself from any decisions pertaining to any transactions between Ocwen and the Ocwen Affiliates.

116.   On April 3, 2013, Ocwen filed a Proxy Statement pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "2013 Proxy") stating the following with respect to Defendant Erbey and his relationship with the Ocwen Affiliates:

> Mr. Erbey currently serves as Executive Chairman of Ocwen and Chairman of Altisource, HLSS, Altisource Residential Corporation ("Residential") and Altisource Asset Management Corporation ("AAMC"). As a result, he has obligations to the Company as well as

to Altisource, HLSS, Residential and AAMC. As of December 31, 2012, Mr. Erbey owned or controlled more than 13.1% of Ocwen's common stock, 23.4% of Altisource's common stock, 2% of HLSS ordinary shares, 23% of Residential's common stock and 23% of AAMC's common stock. ***Due to the nature of Mr. Erbey's obligations to each of the companies, he recuses himself from decisions pertaining to any related transactions.***

(Emphasis added).

117.   The 2013 Proxy was false and misleading as it failed to disclose to investors that defendant Erbey did not recuse himself from decisions involving the Ocwen Affiliates and in fact, as set forth in further detail below, approved related party transactions without any involvement or review by the Board.

118.   Additionally, throughout the Relevant Period, the Individual Defendants' public statements repeatedly stated Ocwen's purported ability to service loans in compliance with regulatory requirements.   In particular, Defendants attributed this alleged competitive advantage  to the Company's use of REALServicing, the mortgage servicing platform Ocwen leased from Altisource. Ocwen intended to transfer loans serviced on the platforms acquired from Homeward and ResCap to REALServicing.  The Individual Defendants praised REALServicing's "scalability," *i.e.,* its capacity to handle the rapid growth in Ocwen's servicing portfolio.

119. Following the ResCap acquisition, Ocwen announced a plan to capitalize on REALServicing's purported cost benefits by transitioning ResCap's loans from FiServ, ResCap's servicing platform, onto Altisource's REALServicing platform.

120. On May 2, 2013, Ocwen issued a press release announcing its financial results for the first quarter of 2013.  The press release stated in relevant part:

> Ocwen Financial Corporation, (NYSE:OCN), a leading financial services holding company, today reported Net income of $45.1 million, or $0.31 per share, for the first quarter of 2013 compared to Net income of $19.3 million, of $0.14 per share, for the first quarter of 2012.  Ocwen produced record revenue of $406.7 million, up 147% from the first quarter of 2012.  Income from operations grew by 108% to $163.1 million for the first quarter of 2013 as compared to $78.4 million for the first quarter of 2012.
>
> Ocwen's normalized pre-tax earnings were $101.4 million, a 90% increase over normalized pre-tax earnings in the first quarter of 2012 and a 22% increase over the fourth quarter of 2012.  The adjustments in the first quarter of 2013 included: $38.2 million of transition expenses; the write-off of $17.0 million of unamortized deferred costs and discount associated with the early termination and replacement of a senior secured term loan facility; and $5.1 million of contribution from sold operations.  Ocwen generated cash flow from operations of $401.9 million.   After reducing this amount for the repayment of related match funded debt, the Company generated adjusted cash flow from operations of $265.8 million.

121. The press release quoted defendant Erbey as stating in relevant part as follows:

"The Company's string of record quarterly revenues will continue into the second quarter as we benefit from a full quarter of ResCap revenue and our recent acquisition of Ally Bank's mortgage servicing rights . . . Ocwen's core earnings and cash-flow were strong in the first quarter, and *we should see these trend higher as a percentage of revenue as we drive down costs and delinquencies on newly acquired business.  Ocwen's lower funding costs and improving pre-pay speeds on non-prime loans should also support better performance versus our original expectations.*"

"*As a leader in the industry, Ocwen has a long and successful history of adding business in an accretive and disciplined manner.  Ocwen remains very well-positioned with the lowest cost to service for non-performing loans in our industry and superior ability to bring down delinquencies.*  The Company has a substantial pipeline, which has grown to $375 billion.  With one of the strongest balance sheets in the industry, *Ocwen is well positioned to produce strong earnings, expand margins and increase cash-flow.*"

(Emphasis added).

122.   The press release further quoted defendant Faris as stating the following in relevant part:

"*Ocwen's first quarter continued the pattern of strong financial performance and growth we have experienced over the past three years* . . . Declining pre-payments on our legacy non-agency portfolio combined with lower interest expense on advances should strengthen our earnings picture.  Our integration of both Homeward and ResCap is progressing as planned, and we completed the transition of Homeward serviced loans to the Ocwen platform in mid-April.  Moreover, our successful acquisition of Ally's Fannie and Freddie portfolios demonstrates the value of ResCap's prime loan servicing capability to our ongoing growth."

68

"In the first quarter of the year, Ocwen completed 24,184 modifications. We would expect quarterly modification volume to increase as our modification programs are applied to the newly acquired servicing portfolios. *We are very proud of our ability to help families avoid foreclosure by providing sensible solutions, including loan modifications, short sales and deeds-in-lieu of foreclosure. Ocwen is the industry leader in helping distressed borrowers with unique programs such as our share appreciation modification and technology that allows us to customize officers to the specific circumstances of each borrower.*"

(Emphasis added).

123. On May 8, 2013, the Company filed a Form 10-Q with the SEC (the "2013 1Q 10-Q") which was signed by Defendant Britti and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed SOX certifications by defendants Britti and Faris, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financing.

124. The 2013 1Q 10-Q also falsely reassured investors that Ocwen was continuing to cooperate with the NY DFS and the terms of the consent order by stating: "on December 5, 2012, we entered into a Consent Order with the NY DFS in which we agreed to the appointment of an independent Monitor to oversee our compliance with the Agreement on Servicing Practices. Ocwen's understanding is

69

that NY DFS has selected the firm which will act as the Monitor, and we intend to continue to cooperate with the NY DFS and the Monitor once the NY DFS and the Monitor finalize the terms of the engagement."

125.   The 2013 1Q 10-Q reiterated Defendant Erbey's position as chairman of the Board of Altisource, HLSS, Residential and AAMC and disclosed that Erbey owned and/or controlled 13% of the common stock of Ocwen, approximately 26% of Altisource's common stock, 24% of Residential's common stock, 27% of AAMC's common stock and 2% of HLSS's common stock.

126.   The 2013 1Q 10-Q also stated the following with respect to certain services provided to Ocwen by Altisource:

> ***Certain services provided by Altisource under these contracts are charged to the borrower and/or loan investor.***   Accordingly, such services while derived from our loan servicing portfolio, are not reported as expenses by Ocwen.  These services include residential property valuation, residential property preservation and inspection services, title services and real estate sales.

> Our business is currently dependent on many of the services and products provided under these long term contracts which are effective through 2025.  The contracts include renewal provisions.  ***We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.***

(Emphasis added).

127.   The Form 10-Q also stated the following regarding the Company's internal control over financial reporting:

**Controls and Procedures**

Our management, under the supervision of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and15d-15(e) of the Exchange Act), as of March 31, 2013. ***Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2013, our disclosure controls and procedures (1) were designed and functioning effectively*** to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information is required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

No change in our internal control over financial reporting (as defined by Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) occurred during the fiscal quarter ended March 31, 2013 that has materially affected, or is likely to materially affect, our internal control over financial reporting.

128.   Additionally, the 2013 1Q 10-Q credited the Company's growth potential to the Company's "low cost and [ ] high-quality servicing platform," REALServicing:

> We expect that other non–prime and prime servicing platforms and servicing portfolios will come to market in the next several months. We are currently tracking potential MSR acquisition opportunities with a total UPB of approximately $375.0 billion. We believe that servicing and subservicing opportunities with an aggregate UPB of up to $1.0 trillion could come to market in the next 2 to 3 years. ***To the extent that we find these opportunities to be attractive, we believe that we are positioned to effectively compete for such opportunities in light of our low cost and our high–quality servicing platform. Our technology also provides us the ability to quickly scale our servicing operations to handle acquired loan portfolios.***

(Emphasis added).

129.   Additionally, the Individual Defendants continued to tout the multiple advantages of Ocwen's servicing platform.  During a May 21, 2013 presentation at the Barclay's High Yield and Syndicated Loan Conference (the "May 21, 2013 Conference"), defendant Britti, Ocwen's then CFO, stated that Ocwen has "the lowest cost platform in the  industry," which provided the Company with "a substantial cost advantage." In particular, Britti suggested that it cost Ocwen just $250 per year to service a non-performing loan, or 70% less than the more than $800 a year spent by Ocwen's competitors. Defendant Erbey echoed these

sentiments during an August 1, 2013 conference call with analysts and investors discussing the Company's financial results for the period ended June 30, 2013 ("2Q 2013") (the "August 1, 2013 Conference Call"), stating that "Ocwen's cost to service non-performing loans is 70% lower than the industry average," and that REALServicing allows Ocwen "to manufacture new capacity more efficiently and effectively than other servicers."

130.   Continuing on its path toward rapidly becoming one of the nation's largest mortgage servicers, Ocwen announced on June 13, 2013 that it had entered into an agreement with OneWest Bank, FSB ("OneWest") to purchase approximately $78 billion in UPB of MSR. The Company's common stock price increased by approximately 3.58% following this news, from a close of $44.16 on June 12, 2013 to close at $45.74 on June 13, 2013.

131.   Analysts again responded favorably to the Company's June 13, 2013 announcement. For instance, Piper Jaffray stated that same day "[w]e conservatively believe this is $0.50 to $.60 accretive for 2014 as the transaction is expected to close 2H2013." The following day, Compass Point reiterated its "Buy" rating and raised its price target on Ocwen to $49 from $44.  Sterne Agee also positively reported on June 14, 2013 that "[t]he acquisition of

$78 billion in servicing was done at a better price than expected and has the

potential to contribute $0.40 to $0.50 per share from the servicing assets in FY14."

132.   On August 1, 2013, Ocwen issued a press release announcing its

operating results for the second quarter of 2013.   The press release stated the

following in relevant part:

> Ocwen Financial Corporation, (NYSE:OCN), a leading financial services holding company, today reported Net income of $76.7 million, or $0.53 per share, for the second quarter of 2013 compared to Net income of $44.8 million, or $0.32 per share, for the second quarter of 2012.  Ocwen produced record revenue of $530.0 million, up 151% from the second quarter of 2012.  Income from operations grew by 24% to $155.2 million for the second quarter of 2013 as compared to $125.5 million for the second quarter of 2012.  Ocwen's Net Cash provided by operating activity was $475.1 million.
>
> Net income for the six months ended June 30, 2013 is $121.9 million, or $0.84 per share, as compared to $64.2 million, of $0.47 per share, for the same period in 2012.  Revenue in the first half of 2013 increased 149% from the first half of 2012 to a total of $934.8 million
>
> Ocwen's normalized pre-tax earnings were $165.9 million, a 130% increase over normalized pre-tax earnings in the second quarter of 2012 and a 64% increase over the first quarter of 2013.  Pre-tax earnings on a GAAP basis for the second quarter of 2013 were $87.5 million, a 71% increase over the first quarter of 2013.  The largest normalizing item is a net addition to reserves of $52.8 million for an expected contribution to a consumer relief fund pursuant to a possible settlement with state and federal agencies.  In addition, Ocwen incurred $26.5 million in transition expenses related to the recent Homeward, ResCap and Ally transactions.  Lastly, the normalization reverses $0.9 million of income contribution from sold operations.

133.   The press release also announced that, in addition to the OneWest deal, on June 26, 2013, it had entered into an agreement to purchase MSR and advances related to $8.3 billion of largely non-agency UPB from Greenpoint Mortgage Funding, Inc. ("Greenpoint").

134.   Moreover, defendant Erbey stated the following in the August 1, 2013 press release pertaining to the Company's performance:

> "Moreover, regulatory and market trends, including greater prospects for GSE legislation and more private capital flowing into mortgage credit, provide excellent long-term prospects for Ocwen.  We continue to build capacity in anticipation of further acquisitions to meet our obligations to our clients, borrowers, RMBS investors and shareholders."

135.   The press release also quoted defendant Faris praising the unique capabilities and benefits attributed to Ocwen's REALServicing platform:

> ***"We are pleased to have made progress toward a possible agreement with state and federal agencies relating to mortgage servicing practices covering Homeward, Litton and Ocwen.  We have established a reserve based on our best estimate of the net amount to be contributed by Ocwen to a consumer relief fund*** . . . Ocwen completed 28,137 modifications in the quarter, which is an increase of 16.3% over last quarter.  Since 2009, Ocwen has helped over 340,000 families stay in their homes through sensible modifications.  ***We are proud to have one of the best modification results of any servicer.  Based on data from private-label securities, Ocwen consistently posts the highest rate of modifications and the lowest re-default percentage on modified non-prime loans.  These results are possible***

*because of the unique capabilities embedded in our industry leading servicing platform."*

(Emphasis added).

136.   On August 6, 2013, the Company filed a Form 10-Q with the SEC (the "2013 2Q 10-Q") which was signed by Defendant Britti and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed SOX certifications by defendants Britti and Faris, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financing.

137.   The 2013 2Q 10-Q reiterated Defendant Erbey's position as chairman of the Board of Altisource, HLSS, Residential and AAMC and disclosed that Erbey owned and/or controlled 13% of the common stock of Ocwen, approximately 23% of Altisource's common stock, 9% of Residential's common stock, 25% of AAMC's common stock and 1% of HLSS's common stock.

138.   The 2013 2Q 10-Q also stated the following:

Our business is currently dependent on many of the services and products provided under these long term contracts which are effective through 2025.  The contracts include renewal provisions.  *We believe the rates charged under these agreements are market rates* as they are materially consistent with one or more of the following: the fees

charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers. (Emphasis added).

\*\*\*

**Regulatory Contingencies**

On January 18, 2012, OLS received a subpoena from the New York Department of Financial Services (NY DFS) requesting documents regarding OLS' policies, procedures and practices regarding lender-placed or "force-placed" insurance which is required to be provided for borrowers who allow their hazard insurance policies to lapse. Separately, on December 5, 2012, we entered into a Consent Order with the NY DFS in which we agreed to the appointment of an independent Monitor to oversee our compliance with the Agreement on Servicing Practices. NY DFS selected the firms that will act as the Monitor, and their formal engagement commenced effective July 1, 2013. The engagement will last until July 1, 2015, and *we intend to continue to cooperate with the NY DFS and the Monitor.*

As previously reported, on August 13, 2012, OLS received a request from the MMC to provide information and data relating to our loan servicing portfolio, including loan count and volume data, loan modifications, fees assessed, delinquencies, short sales, loan-to-value data and rating agency reports. The MMC, along with the CFPB, certain state Attorneys General and other agencies who were involved in the National Mortgage Settlement executed on February 9, 2012 by the five large banks (collectively, the Regulators), also requested that we indicate our position on behalf of OLS and Litton on the servicing standards and consumer relief provisions contained in that Settlement. In response, we indicated our willingness to adopt the servicing standards set out in the National Mortgage Settlement with certain caveats and to undertake various consumer assistance commitments in the form of loan modifications and other foreclosure avoidance alternatives. On February 26, 2013, the Regulators requested that, in

addition to committing to the servicing standards and loan modifications, we also consider a proposal to contribute to a consumer relief fund that would provide cash payments to certain borrowers foreclosed upon by OLS and various entities we have acquired. In subsequent discussions, it was clarified that the Regulators sought our agreement on servicing standards, loan modifications and the proposed consumer relief fund to settle and release various potential legal claims against Ocwen, Litton and Homeward arising out of MMC examinations and potential follow on federal and/or state enforcement actions (the Proposed Regulators' Settlement). In light of the substantial progress the parties have made toward an agreement in principle regarding the Proposed Regulators' Settlement, we believe such a settlement is probable. Consummation of a final settlement would be subject to completion of definitive settlement documents acceptable to all parties, the participation of all relevant regulatory agencies, and execution of certain contractual undertakings by the sellers of Litton and Homeward. In the event a final settlement is not concluded, we will defend any ensuing legal proceedings vigorously. As disclosed in Note 16 – Other Liabilities, ***we have established a liability of $66.4 million for the Proposed Regulators' Settlement.***

(Emphasis added).

139.  The Form 10-Q also stated the following regarding the Company's

internal control over financial reporting:

### Controls and Procedures

Our management, under the supervision of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and15d-15(e) of the Exchange Act), as of June 30, 2013.  ***Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of June 30, 2013, our disclosure controls and procedures (1) were designed and functioning effectively*** to

ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information is required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

No change in our internal control over financial reporting (as defined by Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) occurred during the fiscal quarter ended June 30, 2013 that has materially affected, or is likely to materially affect, our internal control over financial reporting.

(Emphasis added).

140.   The 2013 2Q 10-Q once again attributed Ocwen's growth potential to its purported "low cost, high-quality servicing platform," which can be "quickly scale[d] . . . to handle acquired loan portfolios."

141.   On September 26, 2013, the Company received a letter from the SEC concerning its 2013 2Q 10-Q.  Specifically, the SEC questioned the size of the reserve Ocwen established under the Proposed Regulators' Settlement:

We note the Company established a reserve of $66.4 million as of June 30, 2013 under the Proposed Regulators' Settlement.  ***Please tell***

*us and revise future filings, to address whether there is an exposure to loss in excess of the amount accrued and what the reasonably possible loss or additional loss may be*.  We reference ASC 450-20-50 paragraph 3.

(Emphasis added).

142.  In a letter dated October 10, 2013, Ocwen responded to the SEC as follows:

The Company continues to engage with the Multi-State Mortgage Committee of the Conference of State Banking Regulators, the Consumer Finance Protection Bureau and various state Attorneys General in connection with certain foreclosure related matters and is in the process of completing definitive settlement documents in connection with a proposed settlement therewith. ***As a result, the Company has assessed the likelihood of loss in excess of the amount accrued for the Proposed Regulators' Settlement as remote.*** In future filings, if the matter has not been settled and the Company determines that there is at least a reasonable possibility that an exposure to loss exists in excess of the amount accrued, it will disclose an estimate of such additional loss or range of loss or a statement that such an estimate cannot be made.

(Emphasis added).

143.  On October 31, 2013, the Company issued a press release reporting the Company's operating results in the third quarter of 2013.  The press release stated the following in relevant part:

Ocwen Financial Corporation, (NYSE:OCN), a leading financial services holding company, today reported Net income of $67.0 million, or $0.44 per share, for the third quarter of 2013 compared to

Net income of $51.4 million, or $0.37 per share, for the third quarter of 2012.  Ocwen generated revenue of $531.2 million, up 128% from the third quarter of 2012.  Income from operations grew by 32% to $185.0 million for the third quarter of 2013 as compared to $114.0 million for the third quarter of 2012.

Net income for the nine months ended September 30, 2013 is $188.9 million, or $1.27 per share, as compared to $115.6 million, of $0.84 per share, for the same period in 2012.  Revenue for the first nine months of 2013 increased 144% from the first nine months of 2012 to a total of $1.48 billion.

Pre-tax earnings on a GAAP basis for the third quarter of 2013 were $76.3 million, a 6% decline as compared to the third quarter of 2012.  Ocwen's normalized pre-tax earnings for the third quarter of 2013 were $147.0 million, an 82% increase from the third quarter of 2012.  Ocwen incurred a total of $70.7 million in normalized expenses in the third quarter of 2013.  There were no normalizing items in the third quarter of 2012.

144.  Moreover, defendant Erbey stated the following in the October 31, 2013 press release:

"Ocwen's revenue growth and cash-flow remain very strong with revenue from our existing portfolio trending ahead of projections . . . Notwithstanding our record revenues, revenues were suppressed due to delays, that have now been resolved, in boarding the OneWest transaction.  As expected, margins were below historical levels due to the timing involved in transitioning ResCap and OneWest.  ***We have been quite cautious in our servicing transfers making certain that we have sufficient resources to support the transition of these portfolios.  In the case of OneWest, we were fully-staffed well in advance of boarding the loans.***  We feel very comfortable that once we have completed the ResCap transition to the Ocwen technology platform, we will return to our historical margins.  Prepayment rates

fell substantially in the quarter, which bodes well for future revenues. The Company's current pipeline of potential new business opportunities remains at about $400 billion in unpaid principal balance (UPB). We anticipate that at least $100 billion in UPB will be awarded by sellers before the end of the year."

(Emphasis added).

145. The press release also quoted defendant Faris as stating the following in relevant part:

> *"Ocwen continues to seek sensible modifications and other loan resolutions that help struggling families while providing more cash-flow to mortgage investors. We are proud to have one of the best pre-foreclosure resolution rates of any servicer.* The superiority of Ocwen's servicing was once again confirmed in a recently published report by Moody's that tracked over 1 million loans in default at the end of 2008 through mid-2013. Ocwen's overall performance ranked number one. *These results are possible because of the unique capabilities embedded in our industry lending servicing platform."*

(Emphasis added).

146. Following its earnings announcement for the third quarter of 2013, on October 31, 2013, the Company held a conference call with analysts and investors to discuss Ocwen's operations and business prospects. Defendant Erbey stated the following with respect to the Company's ability to comply with regulatory requirements, in relevant part:

> Moving onto the regulatory front. Earlier this month the CFPB provided guidance to mortgage servicers for implementing new rules

announced earlier this year and scheduled to take effect in 2014. As we have stated before, we support efforts by the CFPB and other state and federal regulatory agencies to support – to provide more clarity with regard to mortgage servicing and origination rules and requirements. Greater clarity reduces risk for the industry and allows us to plan appropriately for any necessary changes. ***Ocwen is well-positioned to comply with all the new requirements. In most cases we have already been following similar rules under subservicing or purchase agreements related to settlements by the large banks. More broadly, these new procedures should level the playing field across the servicing industry as smaller servicers would now need to meet the same requirements as larger servicers such as Ocwen.***

With regard to the settlement we disclosed earlier this year, in the second quarter 2013 we established a reserve, ***which we believe covers Ocwen's exposure for a probable settlement with state and federal agencies.*** At this time, we have no additional information to provide. We remain in discussions and will provide more details at the appropriate time.

(Emphasis added).

147. Additionally, Defendant Faris made the following remarks regarding the Company's continued effort in complying with regulatory requirements throughout the transfer process:

Moving on to the regulatory front. Earlier this month, the CFPB provided guidance to mortgage servicers for implementing new rules announced earlier this year and scheduled to take effect in 2014. As we stated before, we support efforts by the CFPB and other state and federal regulatory agencies to provide more clarity with regard to mortgage servicing and origination rules and requirements. Greater clarity reduces risk for the industry and allows us to plan appropriately

83

for any necessary changes. ***Ocwen is well positioned to comply with all the new requirements.***

***Integration costs have been somewhat higher than expected as we have been careful to assure excellent customer service and strong compliance throughout the transfer process.*** The ResCap integration costs are likely to continue at a high level through the end of the year and then taper in Q1 and Q2 of next year.  We also anticipate incurring a contract breakage expense when we finally exit the ResCap servicing platform of about $19 million.  Nevertheless, we expect the long-term returns on the acquisition to be better than originally modeled as revenues are trending ahead of expectations.

(Emphasis added).

148.   On November 5, 2013, the Company filed a Form 10-Q with the SEC (the "2013 3Q 10-Q"), which was signed by Defendant Britti and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed SOX certifications by defendants Britti and Faris, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financing.

149.   The 2013 3Q 10-Q also reiterated the Company's entry into the Consent Order and reassured investors that the Company intended to cooperate with the NY DFS and the Monitor during its investigation.

150.   The 2013 3Q 10-Q reiterated Defendant Erbey's position as chairman of the Board of Altisource, HLSS, Residential and AAMC and disclosed that Erbey owned and/or controlled 13% of the common stock of Ocwen, approximately 23% of Altisource's common stock, 4% of Residential's common stock, 9% of AAMC's common stock and 1% of HLSS's common stock.

151.   The 2013 3Q 10-Q also stated the following with respect to the rates charged by Altisource to Ocwen which ultimately get passed down to the borrowers:

> Our business is currently dependent on many of the services and products provided under these long term contracts which include renewal provisions. ***We believe the rates charged under these agreements are market rates*** as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.

(Emphasis added).

152.   The Form 10-Q also stated the following regarding the Company's internal control over financial reporting:

### Controls and Procedures

> Our management, under the supervision of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and15d-15(e) of the Exchange Act), as of September 30, 2013. ***Based***

*on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of September 30, 2013, our disclosure controls and procedures (1) were designed and functioning effectively* to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information is required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

No change in our internal control over financial reporting (as defined by Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) occurred during the fiscal quarter ended June 30, 2013 that has materially affected, or is likely to materially affect, our internal control over financial reporting.

(Emphasis added).

153.   On December 3, 2013, during his opening statements to analysts and investors at an event in Palm Beach, Defendant Erbey emphasized to the audience that he was personally abiding by the rules put in place to avoid the potential conflicts between Ocwen and its affiliated Companies:

One of the things I'd like to stress again is that the strategic allies are not affiliates, that *each company has its own separate board of directors, a majority of whom are independent, and we have robust*

*related party transaction approval process.  Any related party transaction between the companies, I actually re[c]use myself from that position* and we make all of our – reportedly, we make contracts between all of the companies publicly available to you on our website.

(Emphasis added).

154.  Additionally, during the investor presentation, the following key functions of Ocwen's "Compliance Management System were praised:"

    a) Establishes its compliance responsibilities;

    b) Communicates those responsibilities to employees;

    c) Ensures that responsibilities for meeting legal requirements and internal policies are incorporated into business processes;

    d) Reviews operations to ensure responsibilities are carried out and legal requirements are met; and

    e) Takes corrective action and updates tools, systems, and materials as necessary.

155.  Additionally, the Company went on to state the following:

I'll talk to you little bit about ways to envision the parts of a compliance management system and this slide breaks it into really four parts, four broad categories. First is reporting, the second is assessing, third is policing, and the fourth is monitoring. . . . *The important part from our perspective and that of our primary regulators is that these four functions are all covered. And at Ocwen, we believe we have that structure*.

87

(Emphasis added).

156.   The statements set forth in paragraphs 102-107, 116, 118-155 were false and misleading because as set forth below, the Individual Defendants misrepresented and/or failed to disclose that: (i) Ocwen lacked sufficient internal controls which caused the Company to engage in significant and systemic misconduct at every stage of the mortgage servicing process, including (a) taking advantage of homeowners with servicing shortcuts and unauthorized fees, (b) deceiving consumers about foreclosure alternatives and improperly denying loan modifications, and (c) engaging in illegal foreclosure practices and providing consumers with false information; (ii) Ocwen had deficiencies in management control and supervision necessary to ensure Ocwen's compliance with applicable laws and regulations; (iii) due to their ownership of stock in the Ocwen Affiliates, the Individual Defendants were engaging in self-dealing transactions which were adverse to borrowers, mortgage investors and/or Ocwen shareholders for the purpose of benefitting the share price of the Ocwen Affiliates; (iv) Defendant Erbey failed to recuse himself from certain transactions between Ocwen and the Ocwen Affiliates; (v) Altisource imposed wholly unreasonable rates for certain services provided to Ocwen which were ultimately passed on to investors and homeowners;

(vi) Ocwen was experiencing material weaknesses in the adequacy of its internal controls relating to how Ocwen monitors and implements the impact of applicable accounting conventions, including the way in which Ocwen accounted for the sale of MSRs to related company HLSS, which ultimately would lead to the Company restating its financial results for the fiscal year ended December 31, 2013 and the quarter ending March 31, 2014; and  (vii) unlike the FiServ platform, Altisource's REALServicing platform actually lacked certain necessary compliance capabilities.

**The Truth Regarding the Individual Defendants' Wrongful Course of Conduct Starts to Emerge and the Misstatements Continue**

157.   On December 19, 2013, the CFPB, along with the attorneys general of 49 states, concluded a long-standing investigation into Ocwen relating to its loan servicing practices between 2009 and 2012.  The investigation culminated in a settlement and simultaneous filing of a complaint which alleged that Ocwen had engaged in "unfair and deceptive" servicing practices, including: (1) "providing false or misleading information in response to borrower complaints"; (2) "failing to provide accurate and timely information to borrowers who seek information about loss mitigation services, including loan modifications"; (3) "misrepresenting that loss mitigation programs would provide relief from the initiation of foreclosure or further foreclosure efforts"; (4) "providing false or misleading

89

information to consumers about the status of foreclosure proceedings where the borrower was in good-faith actively pursuing a loss mitigation alternative offered by [Ocwen]"; (5) "providing false or misleading reasons for denial of loan modifications"; and (6) "failing to properly calculate borrowers' eligibility for loan modification programs and improperly denying loan modification relief to eligible borrowers."

158.   According to the complaint filed in the Federal District Court in the District of Columbia, Ocwen's violations of consumer financial protections put thousands of people across the country at risk of losing their homes.  Specifically, the complaint says that Ocwen was engaged in the following misconduct:

> **Took advantage of homeowners with servicing shortcuts and unauthorized fees:** Customers relied on Ocwen to, among other things, treat them fairly, give them accurate information, and appropriately charge for services.  According to the complaint, Ocwen violated the law in a number of ways, including:
>
> - Failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements;
> - Charging borrowers unauthorized fees for default-related services;
> - Imposing force-placed insurance on consumers when Ocwen knew or should have known that they already had adequate home-insurance coverage; and
> - Providing false or misleading information in response to consumer complaints.

**Deceived consumers about foreclosure alternatives and improperly denied loan modifications:** Struggling homeowners generally turn to mortgage servicers, the link to the owners of the loans, as their only means of developing a plan for payment. Ocwen failed to effectively assist, and in fact impeded, struggling homeowners trying to save their homes. This included:

- Failing to provide accurate information about loan modifications and other loss mitigation services;
- Failing to properly process borrowers' applications and calculate their eligibility for loan modifications;
- Providing false or misleading reasons for denying loan modifications;
- Failing to honor previously agreed upon trial modifications with prior servicers; and
- Deceptively seeking to collect payments under the mortgage's original unmodified terms after the consumer had already begun a loan modification with the prior servicer.

**Engaged in illegal foreclosure practices:** One of the most important jobs of a mortgage servicer is managing the foreclosure process. But Ocwen mishandled foreclosures and provided consumers with false information. Specifically, Ocwen is accused of:

- Providing false or misleading information to consumers about the status of foreclosure proceedings where the borrower was in good faith actively pursuing a loss mitigation alternative also offered by Ocwen; and
- Robo-signing foreclosure documents, including preparing, executing, notarizing, and filing affidavits in foreclosure proceedings with courts and government agencies without verifying the information.

159. Additionally, as noted by CFPB Director Richard Cordray on the

Ocwen enforcement action press call:

91

The mortgage market is the single largest consumer financial market in the United States, with consumers owing about $10 trillion. Mortgage servicers, who bear responsibility for managing these loans, play a central role in the lives of homeowners. They are the link between a mortgage borrower and a mortgage owner. They collect and apply payments. They work our modifications to the loan terms. And they handle the difficult process of foreclosure. Importantly, consumers cannot take their business elsewhere by voting with their feet. Homeowners are stuck with their mortgage servicer, no matter how good or bad that servicer may turn out to be.

Ocwen specializes in servicing subprime or delinquent loans and it has been greatly expanding its business in the years since the housing collapse. Today it is not only the largest nonbank servicer, but also the fourth-largest mortgage servicer overall in this country. It has acquired smaller competitors such as Homeward Residential and Litton Loan Servicing. And it has taken on servicing duties for some of the big banks. Today its customers number in the millions.

Because Ocwen bought the mortgage servicing rights to millions of existing accounts, for many borrowers Ocwen was not their first servicer. For these struggling homeowners, *the Consumer Bureau believes that too often trouble began as soon as a loan transferred to Ocwen, with Ocwen failing to honor trial modifications that were agreed upon by previous servicers.*

*We believe that Ocwen violated federal consumer financial laws at every stage of the mortgage servicing process. In our complaint filed in federal district court today, we allege that Ocwen took advantage of consumers with servicing shortcuts and unauthorized fees. It misled consumers about alternatives to foreclosures. It provided false or misleading information to consumers about the status of their accounts. It denied loan modifications for eligible homeowners. And it sent documents through the courts after they were robo-signed during the foreclosure process. After examining*

***the potential violations, we have concluded that Ocwen made troubled borrowers even more vulnerable to foreclosure.***

So today's order, to which Ocwen has agreed, requires Ocwen to provide $125 million in refunds to consumers who lost their home to foreclosure while being serviced by Ocwen, Homeward Residential Holdings, or Litton Loan Servicing between 2009 and 2012.   In addition, over a three-year period, Ocwen must complete sustainable loan modifications that result in a reduction in principal totaling $2 billion for homeowners who are underwater and struggling to pay off their mortgagees.  This will bring relief to Ocwen's victims and it will improve conditions in the mortgage market by reducing the number of foreclosures.

***

***But because of its conduct, as described in our complaint, Ocwen will be subject to standards above and beyond the rest of the industry.***   For example, the proposed court order aims to solve problems surrounding Ocwen's handling of loan modifications in transferred loans.  This includes a requirement that when consumers have loss mitigation requests pending with a prior servicer within sixty days of any transfer to Ocwen, Ocwen must resolve the requests. This includes a requirement that Ocwen cannot initiate or continue a foreclosure process until it has done so.

Our order also ensures that Ocwen will adhere to these significant new homeowner protections through greater oversight and a court mandate.  A special independent monitor will have the authority to require Ocwen's compliance and oversee the settlement.  In addition, like the rest of the mortgage servicing industry, Ocwen will have to beef up its standards to ensure that when any of its customers call for help that they get regular and dependable assistance.

***

As to the new standards imposed by the CFPB, Ocwen was required to change the way it services mortgages to ensure that borrowers are protected from the illegal behavior that puts them in danger of losing their homes.  Because of Ocwen's track record of problems handling the large volume of MSRs it has quickly acquired in recent years, Ocwen is also being ordered to adhere to additional consumer protections, including how it manages transferred loans.  Among other things, Ocwen must:

- **Properly process pending requests:** For loans that are transferred to Ocwen, the company must determine the status of in-process loss mitigation requests pending within 60 days of transfer.  Until then, Ocwen cannot start, refer to, or proceed with foreclosure.

- **Honor previous loan modification agreements:**  If the borrower has a loan modification agreement, Ocwen must honor it under the terms of the company that transferred the loan.

- **Ensure continuity of contact for consumers:**  Ocwen will have to ensure that consumers get regular and dependable assistance when they call for help.  This includes requiring more than just a single point of contact assigned to each borrower, but also that other Ocwen employees with access to the borrower's information be available if the borrower wants to speak with someone immediately.

- **Restrict servicing fees:**  All servicing fees must be reasonable, bona fide, and disclosed in detail to borrowers.  For example, Ocwen cannot collect any late fees if a loan modification application is under review or if the borrower is making timely trial modification payments.

- **Notify consumers of loss mitigation options and restrict dual tracking**:  Ocwen generally cannot refer a borrower's

> account to foreclosure while the borrower's application for a
> loan modification is still pending.  If the loan-modification
> request is denied, the borrower can appeal that decision and
> Ocwen cannot proceed to foreclosure until that appeal has been
> resolved.
>
> (Emphasis added).

160.  The servicing reforms set forth in the Consent Judgment (and the National Mortgage Settlement) were also incorporated into the DFS Agreement pursuant to its provision stating that in the event Ocwen "agrees with any other regulator to adopt greater consumer protections or other more rigorous standards than are contained in this Agreement, such other provisions shall be incorporated by reference herein."

161.  Based on the foregoing, it is clear that the problems at Ocwen were not just the work of just a few low level employees but rather were known and allowed by top Company insiders since the violations were extensive, pervasive and represented the business model for the Company when it came to servicing mortgages.

162.  On the very same day, Ocwen filed a Form 8-K with the SEC dismissing the notion that the Consent Judgment subjected it to additional regulation, noting that "it had already been subject to substantially the same

guidelines and oversight with respect to the portion of its servicing portfolio

acquired from ResCap in early 2013."   The Form 8-K stated the following in

relevant part:

> Ocwen Financial Corporation ("Ocwen") has reached an agreement,
> which is subject to court approval, regarding previously disclosed
> matters for which a reserve was previously established, involving the
> federal Consumer Financial Protection Bureau ("CFPB") and various
> state attorneys general and other agencies that regulate the mortgage
> servicing industry (collectively, "Regulators").   As further detailed
> below, during the second quarter of 2013, Ocwen established a
> reserve which is expected to cover all but approximately $0.5 million
> of its direct payment obligations in connection with the agreement.
> The agreement has four key elements:
>
> - A commitment by Ocwen to service loans in accordance with
>   specified servicing guidelines and to be subject to oversight by
>   an independent national monitor for three years.   ***Ocwen is
>   presently subject to substantially the same guidelines and
>   oversight with respect to the portion of its servicing portfolio
>   acquired from ResCap in early 2013***.
>
> - A payment of $127.3 million, which includes a fixed amount
>   for administrative expenses, to a consumer relief fund to be
>   disbursed by an independent administrator to eligible
>   borrowers.   Pursuant to indemnification and loss sharing
>   provisions of applicable acquisition documents, approximately
>   half of this consumer relief fund payment is to be funded by the
>   former owners of certain servicing portfolios previously
>   acquired by Ocwen and integrated into Ocwen's servicing
>   platform.   Ocwen previously established a reserve of $66.4
>   million during the second quarter of 2013 with respect to its
>   portion of the payment into the consumer relief fund.   This

reserve is expected to cover all but approximately $0.5 million of Ocwen's portion of the consumer relief fund payment.

- A commitment by Ocwen to continue its principal forgiveness modification programs to delinquent and underwater borrowers, including underwater borrowers at imminent risk of default, in an aggregate amount of at least $2 billion over three years. These and all of Ocwen's other loan modifications are designed to be sustainable for homeowners and also provide positive net present value outcomes for mortgage loan investors. Principal forgiveness as part of a loan modification is determined on a case-by-case basis in accordance with the applicable servicing agreement. Principal forgiveness does not involve an expense to Ocwen other than the operating expense incurred in arranging the modification, which is part of Ocwen's role as a loan servicer.

- Ocwen and the former owners of certain of the acquired servicing portfolios will receive from the Regulators comprehensive releases, subject to certain exceptions, from liability with respect to residential mortgage servicing, modification and foreclosure practices.

(Emphasis added).

163.   Despite the severe monetary penalties that Ocwen incurred and the stringent guidelines the Company was required to adhere to as a result of the settlement, Ocwen's deceptive and illegal practices did not end.

164.   On February 6, 2014, Ocwen issued a press release announcing that at the request of NY DFS, its mortgage servicing arm has agreed to put an indefinite

hold on its previously announced purchase from Wells Fargo Bank, N.A. of mortgage servicing rights on a portfolio consisting of approximately 184,000 loans with a total principal balance of $39 billion.

165.   On February 26, 2014, NY DFS sent a letter to Ocwen's general counsel regarding the NY DFS monitor's ongoing investigation into the Company, which was disclosed to the market the same day.  The letter stated:

> The Department's ongoing review of Ocwen's mortgage servicing practices **has uncovered a number of potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated.**  Indeed, the facts our review has uncovered to date **cast serious doubts on recent public statements made by the company that Ocwen has a "strictly arms-length business relationship" with those companies.**  We are also concerned that this tangled web of conflicts could create incentives that harm borrowers and push homeowners unduly into foreclosure.  As such, we are demanding additional information on these issues as part of our review.
>
> As you recall, Altisource Portfolio's Chief Risk Officer was removed as a result of the Monitor's review.  During its review, the Monitor discovered that Ocwen's Chief Risk Officer also served as the Chief Risk Officer of Altisource Portfolio, and reported directly to Mr. Erbey in both capacities.  This individual seemed not to appreciate the potential conflicts of interest posed by this dual role, which was particularly alarming given his role as Chief Risk Officer.  He told the Monitor that Ocwen paid his entire salary, and he had apparently never asked which company paid his risk management staff.  Indeed, it remains unclear whether Altisource Portfolio paid any compensation for the Chief Risk Officer's services.  Although he has since been removed as Altisource Portfolio's Chief Risk Officer, his

and Ocwen's failure to affirmatively recognize this conflict demonstrates that the relationship between Ocwen and the affiliated companies warrants further examination.

*Presently, Ocwen's management owns stock or stock options in the affiliated companies. This raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result.*

(Emphasis added).

166.   The NY DFS requested a lengthy list of additional documentation related to the financial interests of Ocwen's employees and the Company's agreements with the related parties.

167.   After the public disclosure of the letter, Ocwen's shares declined $2.76 per share, or almost 7%, closing at $36.76 on February 21, 2014, after closing at $39.52 the day before.

168.   Despite the foregoing disclosure of the Individual Defendants' fraudulent practices, the Company's common stock remained inflated due to the Individual Defendants' continued false and misleading statements and omissions.

169.   On February 27, 2014, the Company issued a press release announcing the Company's earnings for the fourth quarter and full year of 2013.  The press release stated in relevant part:

Ocwen Financial Corporation, (NYSE:OCN), a leading financial services holding company, today reported Net income of $105.3 million, or $0.74 per share, for the fourth quarter of 2013 compared to Net income of $65.3 million, or $0.47 per share, for the fourth quarter of 2012. Ocwen generated revenue of $556.0 million, up 135% from the fourth quarter of 2012. Income from operations grew by 56% to $215.1 million for the third quarter of 2013 as compared to $137.5 million for the fourth quarter of 2012.

Full year Net income for 2013 is $294.1 million, or $2.02 per share, as compared to $180.9 million, or $1.31 per share, for 2012. Revenue for 2013 of $2.0 billion is a 141% increase from 2012.

Pre-tax earnings on a GAAP basis for the fourth quarter of 2013 were $120.1 million, a 57% increase as compared to the fourth quarter of 2012. Ocwen's normalized pre-tax earnings for the fourth quarter of 2013 were $166.9 million, a 100% increase from the fourth quarter of 2012. Ocwen incurred a total of $46.8 million in normalized expenses in the fourth quarter of 2013 that are primarily transition-related expenses associated with 2013 transactions.

Full year pre-tax earnings on a GAAP basis for 2013 were $335.2 million, a 30% increase over 2012. Full year normalized pre-tax earnings for 2013 increased by 101% over 2012 from $289.4 million to $581.2 million.

170. In a conference call with analysts following the issuance of the press release, Defendant Erbey continued to claim that the relationship with the Ocwen Affiliates was an arm's-length relationship:

We received a letter yesterday from the DFS asking about our relationships with four related companies, independent companies. I would note that the agreements among the companies are fully disclosed in our SEC filings, and we believe them to be on an arm's

length basis.  We look forward to addressing the matters raised by DFS and will fully cooperate.

171.   Additionally, during the same conference call, Defendant Faris lauded Ocwen's ability to comply with the more stringent regulatory requirements recently imposed on the Company:

> [T]here is no doubt that the environment particularly with the implementation of the CFPB rules here recently, it is a different regulatory environment than it was a number of years ago and ***I think we are as well positioned as others in the non- bank space or better positioned than others to over time demonstrate how well we do service loans and be a leader in the industry. But we will have to continue to commit management time and resources to that and we are going to do that.***

> (Emphasis added).

172.   On March 3, 2014, the Company filed its Form 10-K with the SEC (the "2013 Form 10-K") disclosing the Company's performance for the full year of 2013.  The 2013 Form-10-K reiterated the conflicts of interest between Defendant Erbey and Altisource and restated the careful steps that the Company takes to ensure that a conflict does not in fact arise:

> We do a substantial amount of business with Altisource, HLSS, AAMC and Residential.  Conflicts may arise between us and one or more of these entities because of our ongoing agreements with them and because of the nature of our respective businesses.

Our executive Chairman is the Chairman of Altisource, HLSS, AAMC and Residential.  As a result, he has obligations to us as well as to Altisource, HLSS, AAMC and Residential and could have, could appear to have or could be alleged to have conflicts of interest with respect to matters potentially or actually involving of affecting us and Altisource, HLSS, AAMC and Residential, as the case may be.  Our Executive Chairman currently has significant investments in Altisource, HLSS, AAMC and Residential and certain of our other officers and directors own stock or options in one or more of Altisource, HLSS, AAMC and Residential.  Such ownership interests could create, appear to create or be alleged to create conflicts of interest with respect to matters potentially or actually involving or affecting us and Altisource, HLSS, AAMC and Residential, as the case may be.

We have adopted policies, procedures and practices to avoid potential conflicts with respect to our dealings with Altisource, HLSS, AAMC and Residential, ***including our Executive Chairman recusing himself from negotiations regarding, and approvals of, transactions with these entities.   We also manage potential conflicts of interest through oversight by independent members of our Board of Directors*** (independent directors constitute a majority of our Board of Directors), and we will seek to manage these potential conflicts through dispute resolution and other provisions of our agreements with Altisource, HLSS, AAMC and Residential.  There can be no assurance that such measures will be effective, that we will be able to resolve all potential conflicts with Altisource, HLSS, AAMC or Residential, as the case may be, or that the resolution of any such conflicts will be no less favorable to us than if we were dealing with a third party that had none of the connections we have with these businesses.  (Emphasis added).

(Emphasis added).

102

173.   The 2013 Form 10-K also continued to misstate that homeowners were not charged inflated fees because the rates charged by Altisource to Ocwen, which ultimately get passed down to the homeowners, are market rates:

> Certain services provided by Altisource under these contracts are charged to the borrower and/or investor.  Accordingly, such services, while derived from our loan servicing portfolio, are not reported as expenses by Ocwen. These services include residential property valuation, residential property preservation and inspection services, title services and real estate sales.
>
> Our business is currently dependent on many of the services and products provided under these long term contracts which include renewal rights. *We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.*

174.   The 2013 Form 10-K also discussed the Consent Order, and the Company continued to falsely assured shareholders that it would comply with the regulatory investigations:

> Separately, on December 5, 2012, we entered into a Consent Order with the NY DFS in which we agreed to the appointment of a Monitor to oversee our compliance with the Agreement on Servicing Practices. The Monitor began its work in 2013 and we continued to cooperate with the Monitor. *We devote substantial resources to regulatory compliance, and we incur, and expect to incur, significant ongoing costs with respect to compliance in connection with the Agreement on Servicing Practices and the work of the Monitor.*  In early February 2014, the NY DFS requested that OLS put an indefinite hold

on an acquisition from Wells Fargo Bank, N.A. (Wells Fargo) of MSRs and related servicing advances relating to a portfolio of approximately 184,000 loans with a UPB of approximately $39.0 billion. The NY DFS expressed an interest in evaluating further our ability to handle more servicing. We have agreed to place the transaction on indefinite hold. We are cooperating with NY DFS on this matter.

In addition, on December 19, 2013, we reached an agreement, which was subject to court approval, involving the CFPB and various state attorneys general and other state agencies that regulate the mortgage service industry. On February 26, 2014, the United States District Court for the District of Columbia entered a consent judgment approving the agreement.

(Emphasis added).

175. In addition, the Individual Defendants also repeated their prior statements concerning Ocwen's ability to comply with its regulatory obligations at a lower cost than its peers through REALServicing. For instance, Ocwen's 2013 Form 10-K stated that it is "an industry leader in terms of [its] cost to service non-performing loans," and that these "substantial cost advantages are primarily a result of proprietary technology and processes." The 2013 Form 10-K also stated that REALServicing allows Ocwen "to operate in a compliant manner in an increasingly complex and highly regulated environment."

176. The 2013 Form 10-K was signed by each of the Individual Defendants, and reiterated the Company's previously announced financial results and financial

positions.  In addition, the 2013 Form 10-K contained signed certifications pursuant to SOX by Defendants Faris and Britti stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

177.  In the SOX Certifications accompanying the 2013 Form 10-K, Defendants Faris and Britti each certified that they are "responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant to have:

    d. "Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared";

    e. "Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of

financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;" [and]

f. "Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation."

178.  These statements were false and misleading because the Individual Defendants continued their pattern of lying to investors by concealing the fact that the Company lacked adequate disclosure controls and procedures and internal control over financial reporting, that the rates charged to Ocwen's customers pursuant to Ocwen's contracts with Altisource were not market rates, that Ocwen had no intent to comply with the regulatory investigations, that the transition to Altisource's REALServicing platform had no effect on Ocwen's ability to operate in a compliant manner, and that the Individual Defendants were participating and/or allowing self-dealing transactions at the expense of shareholders and these practices continued to cause the Company to incur billions of dollars in regulatory fines, penalties and civil liability.

179.   The intense regulatory focus on subprime mortgage servicers prior to and during the Relevant Period, specifically, the efforts of the NY DFS and other regulators to ensure that servicers were acting in the best interests of homeowners, presented a material risk to Ocwen's business growth. This regulatory risk was amplified by Ocwen's tangled relationships with Defendant Erbey and the Ocwen Affiliates.

180.   As discussed above, Defendant Erbey's formation of the Ocwen Affiliates, which ensured that he stood to profit at every step of the mortgage life cycle, created the material risk that he would place his own interests ahead of the interests of homeowners in violation of regulatory controls designed to protect them. While acknowledging investors' focus on the regulatory risk posed by Defendant Erbey's conflicting roles, the Individual Defendants continued to lie to investors throughout the Relevant Period by stating that Ocwen had controls in place to manage potential conflicts with the Ocwen Affiliates, including Erbey's purported recusal from any decisions involving Ocwen and the Ocwen Affiliates.

181.  Despite the Individual Defendants' representations regarding the adequacy of the Company's internal controls, regulators were not convinced.  On April 21, 2014, NY DFS sent a second letter to Ocwen regarding the preliminary

results of the Monitor's review.  This letter focused on the conflicts surrounding Ocwen's use of Altisource's subsidiary, Hubzu, which serves as a real estate auction site for Ocwen's properties.  Altisource has an eight-year agreement to manage distressed and repossessed homes in Ocwen's $435 billion servicing portfolio.  The agreement requires that properties be listed and marketing through Hubzu, even if a distressed borrower has already signed a contract for a short sale.  The letter stated the following in relevant part:

> Our review has raised concerns surrounding conflicted business relationships between Ocwen and Altisource Portfolio.  One particularly troubling issue is the relationship between Ocwen and Altisource Portfolio's subsidiary, Hubzu, which Ocwen uses as its principal online auction site for the sale of its borrowers' homes facing foreclosure, as well as investor-owned properties following foreclosure.
>
> ***Hubzu appears to be charging auction fees on Ocwen-serviced properties that are up to three times the fees charged to non-Ocwen customers[3].***  In other words, when Ocwen selects its affiliate Hubzu to host foreclosures or short sale auctions on behalf of mortgage investors and borrowers, the Hubzu auction fee is 4.5%; when Hubzu is competing for auction business on the open market, its fee is as low as 1.5%.  these higher fees, of course, ultimately get passed on to the investors and struggling borrowers who are typically trying to mitigate their losses and are not involved in the selection of Hubzu as the host site.

---

[3] "As you know, a number of key Ocwen personnel have individual equity ownership stakes in Altisource Portfolio."

108

***The relationship between Ocwen, Altisource Portfolio, and Hubzu raises significant concerns regarding self-dealing.*** In particular, it creates questions about whether those companies are charging inflated fees through conflicted business relationships, and thereby negatively impacting homeowners and mortgage investors. Alternatively, if the lower fees are necessary to attract non-Ocwen business on the open market, it raises concerns about whether Ocwen-serviced properties are being funneled into an uncompetitive platform at inflated costs. As such, we are seeking certain information about Ocwen's use of Hubzu, about the fees charged in connection with Hubzu auctions, and about the value that Hubzu's "customers" gain in exchange for those fees.

(Emphasis added).

182.   The April 21, 2014 letter requested answers to some key questions, including the percentage of Ocwen-serviced properties on Hubzu, whether investors and homeowners are required to use Hubzu for their REO and short sale properties, and a confirmation of the 4.5 percent auction fee on Ocwen properties compared to the lower fee on auctions of properties not serviced by Ocwen. Further, these requests in the April 21, 2014 letter directly contradicted the repeated public statements made by the Individual Defendants that the contracts with Altisource were at market rates because they "are materially consistent with . . . the fees charged by Altisource to other customers for comparable services."

183.   Not surprisingly, the dispute over Altisource's role in sales of distressed properties had been ongoing for the past few years. Real estate agents

109

have long grumbled online at Ocwen for intruding in the short sale process and trying to take a piece of their commissions.  Phillip Querin, a lawyer who represents the Portland Metropolitan Association of Realtors in Oregon previously stated "Ocwen is trying to turn the distressed short sale business into a profit center for itself, above and beyond the servicing fees it is getting."  Likewise, agents claimed that Ocwen and the Ocwen Affiliates were interfering with bona fide short sale contracts and were trying to extract additional commissions from homebuyers.

184.   Notwithstanding the concerns raised by the NY DFS in the April 21, 2014 letter pertaining to the possibility of self-dealing, on April 22, 2014, merely one day later, Ocwen filed a Proxy Statement pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "2014 Proxy") stating the following with respect to Defendant Erbey and his relationship with the Ocwen Affiliates:

> Mr. Erbey currently serves as Executive Chairman of Ocwen and as non-executive Chairman of Altisource Portfolio Solutions S.A. ("Altisource"), Altisource Residential Corporation ("Residential") and Altisource Asset Management Corporation ("AAMC").  As a result, he has obligations to the Company as well as to Altisource, Residential and AAMC.   As of December 31, 2013, Mr. Erbey owned or controlled approximately 13% of Ocwen's common stock, 26% of Altisource's common stock, 5% of Residential's common stock and 27% of AAMC's common stock.  As of December 31, 2013, Mr. Erbey also held 4,620,498 options to purchase Ocwen's common stock, of which 2,845,498 were exercisable, and he held 873,501 options to purchase Altisource common stock, 291,164 options to

purchase Residential common stock and 87,350 options to purchase AAMC common stock, all of which were exercisable.  Mr. Erbey is also the non-executive Chairman of Home Loan Servicing Solutions ("HLSS") and owned approximately 1% of HLSS' ordinary shares as of December 31, 2013.  We do not consider Mr. Erbey to have a direct or indirect material interest under applicable Securities and Exchange Commission rules in our transactions with HLSS.  ***Due to the nature of Mr. Erbey's obligations to each of the companies, he recuses himself from decisions pertaining to any transactions between them.***

(Emphasis added).

185.  The 2014 Proxy was false and misleading as it failed to disclose to investors that defendant Erbey did not recuse himself from decisions involving the Ocwen Affiliates and in fact, as set forth below in paragraph 201, approved related party transactions without any involvement or review by the Board.

186.  In spite of the foregoing, the Individual Defendants continued to issue false and misleading statements to the public regarding the Company.  On May 1, 2014, Ocwen issued a press release announcing the Company's earnings in the first quarter of 2014 and commenting on Ocwen's strong commitment to regulatory compliance.  The press release stated in relevant part:

> Ocwen Financial Corporation, (NYSE:OCN), a leading financial services holding company, today reported Net income of $75.8 million, or $0.54 per share, for the first quarter of 2014 compared to Net income of $45.1 million, or $0.31 per share, for the first quarter of 2013.  Ocwen generated revenue of $551.3 million, up 36% from the first quarter of 2013.  Income from operations grew by 24% to $202.1

million for the first quarter of 2014 as compared to $163.6 million for the first quarter of 2013.

Pre-tax earnings on a GAAP basis for the first quarter of 2014 were $89.0 million, a 73% increase as compared to the fourth quarter of 2013.  Ocwen's normalized pre-tax earnings for the first quarter of 2014 were $114.0 million, a 12% increase from the first quarter of 2013.  Ocwen incurred a total of $25.0 million in normalized expenses in the first quarter of 2014 that were primarily transition-related expenses.

"Going forward, we believe compliance and counterparty strength will be among the most important factors determining long-term success in the servicing business. *We consider our solid balance sheet, National Mortgage Settlement compliance and long history of success in large servicing transfers, where we are able to substantially reduce delinquencies and keep more people in their homes, to be substantial competitive advantages.* Ocwen is the only non-bank servicer to be subject to its own National Mortgage Settlement that applies across the entire servicing portfolio, and we maintain the strongest capital ratios among large non-bank servicers. In fact, we hold more capital relative to mortgage servicing rights than most banks," commented Bill Erbey, Ocwen's Chairman. "However, increased compliance and operational risk management does not come without a cost, as you can see from our first quarter normalized earnings."

*"Ocwen continues to work cooperatively with the New York Department of Financial Services to address their concerns that led to an indefinite hold on our Wells Fargo transaction,"* said Ron Faris, President and CEO. *"We believe that increased regulatory scrutiny will, over time, benefit the industry and Ocwen by building greater confidence in the system and rewarding those with efficient and effective servicing processes.* Nevertheless, new requirements and the associated investments have raised costs for the industry, including Ocwen. This places an increased premium on operational

scale and proficiency in operations, two areas of competitive strength for Ocwen."

(Emphasis added).

187.   On May 2, 2014, the Company filed a Form 10-Q ("2014 1Q 10-Q") with the SEC which was signed by Defendant Britti and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed SOX certifications by defendants Britti and Faris, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financing.

188.   The 2014 1Q 10-Q reiterated Defendant Erbey's position as chairman of the Board of Altisource, HLSS, Residential and AAMC and disclosed that as of March 31, 2014, Erbey owned and/or controlled 13% of the common stock of Ocwen, approximately 27% of Altisource's common stock, 4% of Residential's common stock, 25% of AAMC's common stock and 1% of HLSS's common stock.

189.   The 2014 1Q 10-Q also stated the following:

Our business is currently dependent on many of the services and products provided by Altisource under various long-term contracts, including the Support Services, Services, Technology Products Services, Intellectual Property, Data Center and Disaster Recovery Services and Data Access and Services agreements, each of which include renewal provisions. *We believe the rates charged under these agreements are market rates* as they are materially consistent

with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.
(Emphasis added).

190.   The Form 10-Q also stated the following regarding the Company's internal control over financial reporting:

**Controls and Procedures**

Our management, under the supervision of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and15d-15(e) of the Exchange Act), as of March 31, 2014. ***Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2014, our disclosure controls and procedures (1) were designed and functioning effectively*** to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information is required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

No change in our internal control over financial reporting (as defined by Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) occurred during the fiscal quarter ended March 31, 2013 that has materially affected, or is likely to materially affect, our internal control over financial reporting.

114

191.   Thus, the Individual Defendants continued making the foregoing false and misleading statements despite the fact that the NY DFS had confirmed that that the rates charged by Altisource were not of fair market value and that Defendant Erbey, and the Individual Defendants as officers and directors of the Company, were involved in approving conflicted transactions.

192.   On May 19, 2014, the Company filed a Form 8-K with the SEC announcing that on May 14, 2014, the Board appointed Michael R. Bourque, Jr. as Executive Vice President and CFO of Ocwen, effective June 2, 2014.  The Board appointed Defendant Britti as Executive Vice President and Chief Investment Officer, effective June 2, 2014.

193.   On or about May 21, 2014, *Reuters* reported that a number of companies collecting payments on home loans, including Ocwen, were attempting damage control by increasingly demanding that borrowers in litigation sign non-disparagement clauses if they want the terms on their mortgages eased.  In some cases, servicers were also demanding the clauses be inserted in loans modified outside of litigation.  Those clauses prohibit customers from printing or posting anything negative about the companies.

194.   These clauses can hurt borrowers who later have problems with their mortgage collector by preventing them from complaining publicly about their difficulties or suing, lawyers said.  If a collector, known as a servicer, makes an error, getting everything fixed can be a nightmare without litigation or public outcry.

195.  Not surprisingly, Superintendent Lawsky responded strongly to the damage control tactics, stating "[r]eports that Ocwen is imposing a gag rule for certain struggling homeowners – preventing them from criticizing the company – are troubling and deeply offensive.  We will investigate this issue immediately." Superintendent Lawsky further went on to state, "Servicers have a responsibility to act in the best interest of borrowers and investors – not to try and sweep shoddy practices under the rug or muzzle struggling homeowners."

196.  The fact that Ocwen was engaging in such reprehensive tactics was beyond comprehension given that Ocwen was recently coming off a massive settlement with federal and state regulators arising out of Ocwen's significant and systemic misconduct that occurred at every stage of the mortgage servicing process. It was a complete failure of the Individual Defendants' fiduciary responsibilities to allow such conduct while Ocwen remained under such intense scrutiny and

additional rules when it came to mortgage servicing.  Not surprisingly, however, the Individual Defendants' misconduct did not end here.

197.   On July 31, 2014, the Company issued a press release announcing the Company's operating results for the second quarter of 2014.  Investors were surprised to learn that the NY DFS Monitor's review was so widespread that it significantly impacted the Company's performance because this was contrary to previous statements by the Company.  The press release stated the following in relevant part:

> Ocwen Financial Corporation, (NYSE:OCN), a leading financial services holding company, today reported Net income of $67.0 million, or $0.48 per share, for the second quarter of 2014 compared to Net income of $76.7 million, or $0.53 per share, for the second quarter of 2013.  Ocwen generated revenue of $553.1 million, up 2% compared to the second quarter of 2013.  Income from operations grew by 22% to $207.6 million for the second quarter of 2014 as compared to $170.0 million for the fourth quarter of 2013.
>
> Net income for the six months ended June 30, 2014 was $142.8 million, or $1.02 per share, as compared to $121.9 million, or $0.84 per share, for the same period in 2013.  Revenue in the first half of 2014 increased 16% from the first half of 2013 to a total of $1.1 billion.
>
> Pre-tax earnings on a GAAP basis for the fourth quarter of 2013 were $120.1 million, a 57% increase as compared to the fourth quarter of 2012.  Ocwen's normalized pre-tax earnings for the fourth quarter of 2013 were $166.9 million, a 100% increase from the fourth quarter of 2012.  Ocwen incurred a total of $46.8 million in normalized expenses

in the fourth quarter of 2013 that are primarily transition-related expenses associated with 2013 transactions.

Full year pre-tax earnings on a GAAP basis for the second quarter of 2014 were $77.2 million, a 12% decrease as compared to the second quarter of 2013.  Ocwen's normalized pre-tax earnings for the second quarter of 2014 were $110.2 million, a 7% decrease from the first quarter of 2014.  Normalized pretax earnings were impacted by a 2% increase in operating expenses and higher interest expense resulting from Ocwen's recent debt issuances.

During the second quarter of 2014, Ocwen incurred a total of $33.0 million in normalized expenses, including $19.3 million in MSR-related fair value adjustments, $8.3 million of on-going integration and technology-related expenses and $5.4 million of compensation expense associated with the surrender of stock options in the quarter.

*"Our normalized pretax earnings were lower in the quarter as a result of significant compliance and regulatory-related costs and higher interest expense,"* commented Bill Erbey, Ocwen's Executive Chairman.

(Emphasis added).

198.   In a conference call with analysts to discuss the results, CFO Michael R. Borque revealed that these "significant compliance and regulatory-related costs" included $12 million in expenses related to the NY DFS Monitor in the second quarter alone:

However, these favorable items were offset by a significant increase in compliance and the regulatory related costs which were up significantly over the last quarter.  The biggest item was roughly $12 million of expenses for the New York State and national monitors.

These costs are a significant element of our cost base.  It is difficult to anticipate their future magnitude.

I can tell you that we expect to incur roughly $9 million in the third quarter in ongoing monitoring costs, about $3 million lower than we saw in the second quarter.  We believe cost will remain significant throughout the duration of the monitoring periods.

199.   Indeed, this was the first time that the Company had disclosed the impact that the NY DFS Monitor had on the performance of the Company, and it suggested that the review was wider in scope than originally anticipated or disclosed.  In fact, the question and answer session between analyst Kenneth M. Bruce and Defendant Faris revealed the following:

Bruce: Okay.  And in the quarter there was roughly $12 million of monitoring costs.  How sticky are these monitoring costs?  Can you give us some better details as to what they are?  I mean that run rate is close to $50 million a year?

Faris: Yeah.  So, keep in mind that with our new national mortgage settlement, we now have a second monitor.  We previously had just a monitor for the State of New York, now we have the national monitor. And so one of the big reasons for the increase in the quarter was related to the fact that we now have a second monitor that is in there, that wasn't in there before.  And those costs will run for the next three years.  The New York monitor was a two-year period and we're about a year into it, maybe a little bit more.

So there is some volatility month-to-month, quarter-to-quarter simply because largely you are paying for direct cost and time that professional firms hired by the monitor to do the work.  How much time they spend in a quarter can vary from month-to-month, quarter-

119

to-quarter.   So as Michael said, our best estimate of the coming quarter would be – it would be down some, down to $9 million.  But I think he also said in this prepared remarks but we – at this point it's difficult for us to give you a pinpoint amount for every quarter going out in the future because it varies depending on how much time the professional firms spend in any particular period.

Bruce:  I understand.  Is there any way to think about that on an annualized basis in terms of what you think the cost burden on the company will be?

Faris:  Yeah, not really and not to kind of make a projection.  But I think you can think about the fact that we think $9 million is going to be our best estimate for this coming quarter.   So that might be something that you want to think about on a run rate, but again, it can vary.  So I need to put that caveat there, but I think that might be a good way to think about it.

Bruce:  Yeah.  And I appreciate that, and obviously would like to see that sooner than later.  I guess really where I'm going with this is, *if we look at the cost structure that's been put together around compliance and monitoring, you're really talking about something that is borderline between $0.40 and $0.50 of earnings per share. That costs us, from a market – just from a valuation standpoint, something close to $5 per share.*

I think the market is really struggling with understanding what the overall operating costs in this business are going to look like, which has a tremendous impact in terms of the longer-term earnings outlook at the way that the Street's going to value the stock.  Now I know you know that, but we need to get some very good understanding as to how these costs are going to play out over the next several years.  I guess it's a comment.  There is no question.  Thanks for time.

(Emphasis added).

200.   After these earnings figures were announced, the Company's stock nosedived from a closing price of $35.28 on July 30, 2014, to a closing price of $30.17 per share on July 31, 2014.   On August 1, 2014, several analysts downgraded their ratings for the Company based on these results, and the stock continued to decline to a closing price of $27.68 per share on August 1, 2014, representing a decline of more than 25% over these two days alone.

201. The NY DFS's continued investigation into Ocwen's practices revealed even more evidence of self-dealing by the Defendant Erbey on the Individual Defendants' watch.  On August 4, 2014, the NY DFS sent a third letter to Ocwen concerning a "troubling transaction" involving Altisource and force-placed insurance.  The letter stated the following in relevant part:

> As part of the Department's ongoing examination of Ocwen's mortgage servicing practices, we are reviewing a troubling transaction involving Ocwen's related company, Altisource Portfolio Solutions, S.A. ("Altisource"), and the provision of force-placed insurance. Indeed, this complex arrangement appears designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work. ***Additionally, the role that Ocwen's Executive Chairman William C. Erbey played in approving this arrangement appears to be inconsistent with public statements Ocwen has made, as well as representations in Company SEC filings.*** As discussed below, we require certain information about this force-placed insurance arrangement and about Mr. Erbey's role in approving the arrangement.

**Background**

As you know, the Department has previously expressed concerns about Ocwen's use of related companies to provide fee-based services such as property inspections, online auction sites, foreclosure sales, real estate brokers, debt collection, and many others. Because mortgage servicing presents the extraordinary circumstance where there is effectively no customer to select a vendor for ancillary services, Ocwen's use of related companies to provide such services raises concerns about whether such transactions are priced fairly and conducted at arms-length.

The Department now seeks additional information about Ocwen's provision of force-placed insurance through related companies. As you are aware, the Department's recent investigation into force-placed insurance revealed that mortgage servicers were setting up affiliated insurance agencies to collect commissions on force-placed insurance, and funneling all of their borrowers' force-placed business through their own agencies, in violation of New York Insurance Law section 2324's anti-inducement provisions. The Department discovered that servicers' own insurance agencies had an incentive to purchase force-placed insurance with high premiums because the higher the premiums, the higher the commissions kicked back by insurers to the servicers or their affiliates. The extra expense of higher premiums, in turn, can push already struggling families over the foreclosure cliff. In light of the investigation, the Department last year imposed further prohibitions on these kickbacks to servicers or their affiliates.

However, as part of our broader review of ancillary services provided by non-bank mortgage servicers, we are concerned that certain non-bank mortgage servicers are seeking to side-step those borrower protections through complex arrangements with subsidiaries and affiliated companies. Indeed, in recent weeks, we halted one such arrangement at another non-bank mortgage servicing company.

122

**Agreements with SWBC and Altisource**

Based on its investigation and through the Monitor's work, the Department understands that ***Ocwen's force-placed arrangement with Altisource features the use of an unaffiliated insurance agent, Southwest Business Corporation ("SWBC"), apparently a pass-through so that Ocwen and Altisource are not directly contracting with each other, but Altisource can still receive commissions and certain fees seemingly for doing very little work.***

These are the facts established by documents Ocwen provided to the Monitor:  In August 2013, Ocwen appointed an Altisource subsidiary called Beltline Road Insurance Agency, Inc. ("Beltline") as its exclusive insurance representative, purportedly to negotiate and place a new force-placed insurance program for Ocwen.  Ocwen's existing force-placed arrangement with the insurer Assurant was set to expire in March 2014, and Beltline's stated task was to find an alternative arrangement*.  **In January 2014, Altisource provided a memo to the Credit Committee of Ocwen Mortgage Servicing, Inc., recommending, among other things, replacing Assurant with SWBC as Ocwen's managing general agent.  SWBC would then be charged with managing Ocwen's force-placed insurance program, including negotiating premiums with insurers.  As part of this arrangement, Altisource recommended itself to provide fee-based services to SWBC.***

In emails dated January 15 and 16, 2014, ***the transaction was approved by the three members of the Credit Committee: William Erbey, Duo Zhang, and Richard Cooperstein.***  The Credit Committee did not meet to discuss this proposal, no minutes were taken of the Credit Committee's consideration of this proposed transaction, and the proposed transaction apparently was not presented for review or approval to any member of the Ocwen Board of Directors except Mr. Erbey, as Mr. Zhang and Mr. Cooperstein are not members of the Ocwen Board of Directors.

123

Just one month after this Credit Committee approval, on February 26, 2014, the company received the Department's letter raising concerns about potential conflicts of interest between Ocwen and its related public companies.  In that letter, we identified facts that "cast serious doubts on recent public statements made by the company that Ocwen has a 'strictly arms-length business relationship' with those companies," and we specifically referenced the multiple roles played by Mr. Erbey as an area of concern.

***Disregarding the concerns raised in our letter, Ocwen proceeded to execute contracts formalizing this new force-placed arrangement, apparently without further consideration by any Board member other than Mr. Erbey.***  Those contracts, dated as of June 1, 2014, indicate that Altisource will generate significant revenue from Ocwen's new force-placed arrangement while apparently doing very little work.  Indeed, a careful review of these and other documents suggests that Ocwen hired Altisource to design Ocwen's new force-placed program with the expectation and intent that Altisource would use this opportunity to steer profits to itself.

First, Altisource will reap enormous insurance commissions for having recommended that Ocwen hire SWBC.  Under the contracts, Ocwen promises to give its force-placed insurance business to SWBC.  SWBC does the work of negotiating premiums, preparing policies, and handling renewals and cancellations.  For these services, SWBC receives commissions from insurers.  SWBC then passes on a portion of those commissions, constituting 15% of net written premium on the policies, to Altisource subsidiary Beltline, for "insurance placement services."  ***Documents indicate that Ocwen expects to force-place policies on its borrowers in excess of $400 million net written premium per year; a 15% commission on $400 million would be $60 million per year.***  It is unclear what insurance placement services, if any, Altisource is providing to justify these commissions.

Second, Altisource will be paid a substantial annual fee for providing technology support that it appears to be already obligated to provide.

This fee relates to monitoring services, whereby Ocwen pays a company to monitor whether its borrowers' insurance remains in effect. Such monitoring is necessary to establish which borrowers have lapsed on their payments and need to have insurance force-placed upon them. ***Prior to 2014, Ocwen was paying ten cents per loan per month to Assurant for monitoring. In this new arrangement, however, Ocwen agrees to pay double the prior amount – twenty cents per loan per month now paid to SWBC, for each of the approximately 2.8 million borrowers serviced by Ocwen. SWBC, in turn, agrees to pass on fifteen out of that twenty cents to Altisource, or an estimated $5 million per year.*** Altisource provides only one service in exchange for this fee: granting SWBC access to Ocwen's loan files. Altisource, of course, only has access to Ocwen's loan files through its own separate services agreement with Ocwen, which appear to contractually obligate Altisource to provide this access to business users designated by Ocwen to receive such access.

Third, the contracts require SWBC to use Altisource to provide loss draft management services for Ocwen borrowers; to pay Altisource $75 per loss draft for these services; and to pay Altisource an additional $10,000 per month for certain other services.

***

## Ocwen's Public Statements Concerning Transactions with Related Companies

In addition to the issues raised above, the Department has serious concerns about the apparently conflicted role played by Ocwen Executive Chairman William Erbey and potentially other Ocwen officers and directors in directing profits to Altisource, which is "related" to Ocwen but is formally a separate, publicly-traded company. As you know, Mr. Erbey is Ocwen's largest shareholder and is also the Chairman of and largest shareholder in Altisource. In fact, Mr. Erbey's stake in Altisource is nearly double his stake in Ocwen: 29 percent versus 15 percent. ***Thus, for every dollar Ocwen makes, Mr. Erbey's share is 15 cents, but for every dollar Altisource makes, his share is 29 cents.***

125

*The Department and its Monitor have uncovered a growing body of evidence that Mr. Erbey has approved a number of transactions with the related companies, despite Ocwen's and Altisource's public claims – including in SEC filings [] – that he recuses himself from decisions involving related companies. Mr. Erbey's approval of this force-placed insurance arrangement as described above appears to be a gross violation of this supposed recusal policy.*

***

Finally, Ocwen and Altisource state in their public filings that rates charged under agreements with related companies are market rate, [] *but Ocwen has not been able to provide the Monitor with any analysis to support this assertion.*

(Emphasis added).

202.   The foregoing letter from the NY DFS also requested additional documentation from Ocwen regarding fees awarded to Altisource and Defendant Erbey's involvement with the negotiations.

203.   The arrangement addressed in Superintendent Lawsky's August letter, the business dealings between Ocwen and Altisource, and the Individual Defendants' alleged misstatements once again landed Ocwen in trouble with regulators.  Moreover, after the letter was released, the Company's stock dropped approximately 2.5% to close at $26.98 per share from the prior closing of $27.68 per share on Friday, August 1, 2014, further harming the Company.

126

204.   On August 12, 2014, the Company's financial troubles continued when it filed a Form 8-K with the SEC disclosing that it would restate its financial statements for the fiscal year ended December 31, 2013 and the quarter ended March 31, 2014.   According to the Form 8-K, the Company anticipated a determination of a material weakness in the adequacy of its internal controls related to how it monitors and implements the impact of applicable accounting conventions.  The material weakness related to the way in which Ocwen accounted for the sale of mortgage-servicing rights to related company HLSS.  The Company expected that the adjustments would result in an increase in pre-tax income for the year ended December 31, 2013, of approximately $17 million and a reduction in pre-tax income in the first quarter of 2014 by a corresponding amount.

205.   On this news, the Company's stock declined almost 4.5% to close at $25.16 per share, down from the closing price of $26.34 per share the day before, and the Company lost over $133 million in market capitalization.

206.   On August 18, 2014, Ocwen filed the following amended reports with the SEC: 2014 1Q 10-Q/A and 2013 10-K/A.  The 2014 1Q 10-Q/A and 2013 10-K/A reported that corrections in the valuation of its financing liability in relation to MSRs resulted in the following: (i) an increase in interest expense and a

127

corresponding decrease in pre-tax income for the first quarter of 2014 of $17.3 million; (ii) an increase in total liabilities and financing liabilities as of March 31, 2014 of $17.3 million; (iii) a decrease in net income for the first quarter of 2014 of $15.3 million; (iv) a decrease in interest expense and a corresponding increase in pre-tax income for the fourth quarter of 2014 of $4.0 million; (v) a decrease in total liabilities and financing liabilities as of December 31, 2013 of $17.3 million; and (vi) an increase in net income for the fourth quarter of 2013 of $4.0 million.  The amended financial statements also disclosed that Ocwen's disclosure controls and procedures and internal controls over financial reporting were not effective as of December 31, 2013 and March 31, 2014.

207.   On August 18, 2014, the Company filed a Form 10-Q with the SEC Form 10-Q with the SEC (the "2014 2Q 10-Q") which was signed by CFO Michael R. Bourque, Jr. and reiterated the Company's previously announced quarterly financial results and financial position and set forth the restated amounts for Fiscal Year 2013 and the first quarter of 2014.  In addition, the Form 10-Q stated that management determined that a material weakness in internal control over financial reporting existed as of December 31, 2013, and that management concluded that the

Company's internal control over financial reporting was not effective as of June 30, 2014.

208.   The 2014 2Q 10-Q reiterated Defendant Erbey's position as chairman of the Board of Altisource, HLSS, Residential and AAMC and disclosed that Erbey owned and/or controlled 13% of the common stock of Ocwen, approximately 27% of Altisource's common stock, 4% of Residential's common stock, 27% of AAMC's common stock and 1% of HLSS's common stock.

209.   Finally, the 2014 2Q 10-Q disclosed that the Company received a subpoena from the SEC on June 12, 2014 requesting that Ocwen produce documents relating to its business dealings with Altisource, HLSS, AAMC, Residential and the interests of Ocwen's directors and executive officers in those companies.   The Company further disclosed that the SEC plans to serve Ocwen with another subpoena in connection with the amendments to the Company's financial statements for the fiscal year ended December 31, 2013 and the quarter ended March 31, 2014.

210.   The information requested by the SEC implies that the Individual Defendants in breach of their fiduciary duties allowed Defendant Erbey to engage in serious and flagrant self-dealing.

211.  Following this disclosure, on August 28, 2014, Moody's downgraded Ocwen Loan Servicing, LLC's servicer quality (SQ) assessments from SQ2- to SQ3+ both as a primary servicer of subprime residential mortgage loans and as a special servicer of residential mortgage loans[4].  Moody's also lowered the Company's component assessment for loan administration from above average to average.  According to Moody's, the lowered assessments reflected the heightened regulatory scrutiny of Ocwen by the NY DFS and the SEC.

212.  Ocwen's troubles did not end here, however.  As Superintendent Lawsky delved deeper into Ocwen's mortgage servicing practices, he found even more evidence of abuse.  On October 21, 2014, Superintendent Lawsky sent a fourth letter to Ocwen stating the following:

> In the course of the Department's review of Ocwen's mortgage servicing practices, we have uncovered serious issues with Ocwen's systems and processes, *including Ocwen's backdating of potentially hundreds of thousands of letters to borrowers, likely causing them significant harm*.

---

[4] Moody's SQ assessments represent its view of a servicer's ability to prevent or mitigate asset pool losses across changing markets.  Moody's servicer assessments are differentiated in the marketplace by focusing on performance management.  The assessment scale ranges from SQ1 (strong) to SQ5 (weak).  See https://www.moodys.com/research/Moodys-downgrades-Ocwens-SQ-subprime-and-special-servicer-assessments--PR_307465.

In many cases, borrowers received a letter denying a mortgage loan modification, and the letter that was dated more than 30 days prior to the date that Ocwen mailed the letter. These borrowers were given 30 days from the date of the denial letter to appeal that denial, but those 30 days had already elapsed by the time they received the backdated letter. In other cases, Ocwen's systems show that borrowers facing foreclosure received letters with a date by which to cure their default and avoid foreclosure – and the cure date was months prior to receipt of the letter. The existence and pervasiveness of these issues raise critical questions about Ocwen's ability to perform its core function of servicing loans.

***Even worse, Ocwen did nothing to investigate or address the backdating issue when an employee questioned the accuracy of Ocwen's letter dating processes and alerted the company's Vice President of Compliance***. Ocwen ignored the problem for five months until the same employee raised it again. ***Even then, Ocwen failed to launch an appropriate investigation and still has not resolved the issue today, nearly a year after its initial discovery. Ocwen's indifference to such a serious matter demonstrates a troubling corporate culture that disregards the needs of struggling borrowers***.

Ocwen has obligations under both New York and federal law, as well as various agreements with state and federal authorities, regarding how quickly it must communicate with borrowers on matters such as requests for mortgage modifications or the initiation of foreclosure proceedings. Ocwen is not meeting those obligations. ***And given the issues with Ocwen's systems, it may be impossible to determine the scope of Ocwen's non-compliance.***

Ocwen's Backdating and Systems Failures

On June 19, 2014, the Monitor discovered that Ocwen backdated by 41 days a letter denying a mortgage loan modification. The letter Ocwen sent to the borrowers was dated June 14, 2012, but the

system indicated that it was not sent until July 25, 2012. Given the seriousness of this issue, the Monitor immediately demanded an explanation.

*Over the course of the next three months, Ocwen represented to the Department and the Monitor that (1) the issue was isolated to letters of a specific type, (2) the problem affected approximately 6,100 letters, (3) Ocwen discovered the issue in April or May of 2014, and (4) Ocwen implemented changes to its systems in May 2014 that resolved the problem. Each of these representations turned out to be false.*

In the meantime, the Monitor undertook its own investigation into the issue. Within a few days, *the Monitor uncovered nearly a thousand additional backdated letters that Ocwen evidently failed to find in the prior three months*.

The Monitor also discovered inconsistencies in Ocwen's servicing system that *call into question the accuracy and reliability of Ocwen's recordkeeping*. For example, Ocwen's system shows that Ocwen sent a borrower a pre-foreclosure notice dated May 23, 2013, stating that the borrower was in default and at risk of foreclosure. Yet, a conflicting record in Ocwen's system indicates that the notice was created on April 9, 2014 – nearly *one year after* the date of the pre- foreclosure notice. In another example, a letter dated October 29, 2013, warns that the borrower is in danger of foreclosure if he does not make a payment by August 7, 2013, nearly three months prior to the date of the letter. We do not yet know whether this borrower or the many others like him gave up trying to save their homes upon receiving such a letter that appeared to have arrived too late.

Subsequently, under pressure from the Department and the Monitor to identify and disclose the full extent of this issue, Ocwen finally admitted in a memorandum on September 10, 2014, that the backdating issue may not be isolated and that the changes to Ocwen's systems in May 2014 did not fully resolve the problem. However,

Ocwen identified only a fraction of the instances of backdating that had already been uncovered by the Monitor.

The memorandum also repeated the assertion that Ocwen initially discovered the backdating issue in April 2014. However, after persistent questioning from the Monitor for more details surrounding the discovery of the issue, Ocwen informed the Monitor that its investigative team had been mistaken once again. Upon further investigation, *Ocwen discovered that one of its employees identified the problem in November 2013 and informed senior management, including the Vice President of Compliance.*

There is no indication that Ocwen did anything to investigate or remedy the problem in November 2013, nor did it alert its regulators, borrowers, or other interested parties to this issue. Five months elapsed before the same employee raised the issue again in April 2014. It is unclear what Ocwen did, if anything, in April 2014 to investigate the cause of this problem, its scope, or appropriate remedial measures. *What is clear is that it still did not notify regulators, borrowers, or investors of this significant issue, nor did Ocwen personnel conduct due diligence* to ensure that the issue was firmly resolved through the supposed fix in May 2014, or take steps to determine what impact, if any, the backdating may have already had on borrowers. As you know, these issues remain unresolved today.

***

Accurate recordkeeping and timely communications with borrowers is fundamental to servicing distressed loans, particularly where time is of the essence as (1) interest and fees accumulate for borrowers on the brink of foreclosure, and (2) the time period to cure a default or to appeal a denial of a modification or other resolution comes to a close. Borrowers, of course, rely on their servicers to maintain accurate records to ensure that their payments are timely processed and to fully explore their loss mitigation options when they are struggling to make

133

their payments.  Mortgage investors rely on a servicer's records to ensure that they are being properly paid, that liens securing the property are properly filed, and that the servicer is working appropriately to cure borrower defaults.  As a regulator, we rely on a regulated entity's recordkeeping to know whether the company is complying with the law, from notifying borrowers about a change in servicer to ensuring the right to foreclose before filing a foreclosure lawsuit.

In light of these serious issues and the likelihood that thousands of new, inaccurate records are created with each passing day, Ocwen has not approached this problem with the urgency it demands. Ocwen must fix its systems without delay.  To that end, we demand that Ocwen respond to each request by the Monitor promptly and accurately, and that Ocwen dedicate the resources necessary to accomplish this task.  We are directing the Monitor to share its findings with Ocwen so that Ocwen may better understand the severe nature of its own problems.

The stakes for borrowers and investors are enormous. If the Department concludes that it cannot trust Ocwen's systems and processes, then it cannot trust Ocwen is complying with the law. If Ocwen cannot demonstrate immediately that it is capable of properly servicing borrowers' needs, the Department intends to take whatever action is necessary to ensure that borrowers are protected.

(Emphasis added).

213.  In an effort to halt the slide in its stock price, Ocwen, issued a hasty

and reckless press release that same day (the "October 21, 2014 Press Release").

While admitting to the backdating problem, the Company asserted that the

October 21, 2014 Letter was overblown because the actual number of borrowers

whose loans had been affected in New York State was limited to 283, and the issue had been completely resolved.  After markets closed on October 21, 2014, Ocwen, however, quickly reversed its prior position, revealing that the October 21, 2014 Press Release was inaccurate and accordingly retracted it, admitting that, in fact, the Company was unsure how many borrowers were impacted. As the October 21, 2014 Letter disclosed, Ocwen had known about the backdating problem – caused by its faulty REALServicing platform – as early as November 2013 but had ignored repeated warnings to fix it. On October 22, 2014, when Ocwen's shares resumed trading, their price fell a further 11.36% Between October 21, 2014 and October 22, 2014, Ocwen had lost $7.22 in its share price, or $908.35 million from its market capitalization.

214.   On this news, the Wells Fargo deal was perceived as dead due to Ocwen's inability to compete for more MSRs, and, in fact, on November 13, 2014, Ocwen and Wells Fargo mutually agreed to cancel the deal.

215.   On November 21, 2014, the Company filed a Form 8-K with the SEC announcing that on November 20, 2014, Defendant Ross notified the Board of his decision to resign as a director of the Board effective immediately.

216.  On December 16, 2014, Joseph A. Smith, the NY DFS monitor assigned to oversee Ocwen's mortgage servicing practices, issued a scathing report regarding Ocwen's progress for the testing periods ended March 31, 2014 ("Test Period 7") and June 30, 2014 ("Test Period 8") (the "NMS Compliance Report"), which confirmed the inadequacies of Ocwen's REALServicing platform and revealed further weaknesses in the Company's internal control processes related to its obligations under the National Mortgage Settlement.  In particular, the monitor determined that for Test Period 7 – the first period that loans on REALServicing were tested – the work of Ocwen's Internal Review Group ("IRG") responsible for evaluating Ocwen's compliance with the National Mortgage Settlement was unreliable because: (1) Ocwen and the IRG were experiencing "difficulty identifying and extracting valid loan testing populations" due to "[t]he REALServicing platform to which the ResCap loans were being transferred from FiServ[;]" and (2) investigation into a current IRG employee's claims of irregularities and improprieties in the IRG's operations uncovered that "the IRG's processes and procedures . . . lacked the critical keys to integrity mandated in the Enforcement Terms" of the National Mortgage Settlement.  As a result, the monitor engaged an independent accounting firm, McGladrey LLP

("McGladrey") to retest Ocwen's performance on a number of metrics for Test Periods 7 and 8 and to oversee the IRG's work for subsequent testing periods. In addition, effectively conceding these deficiencies, Ocwen undertook a number of remedial actions, such as adopting corporate governing principles regarding the independence of the IRG and the integrity of its work, restructuring the IRG, providing the monitor with enhanced access to loan-testing information, and establishing a hotline to the monitor's office for IRG employees to report issues concerning the IRG and its operations.

217.   Separately, the monitor revealed in the NMS Compliance Report that, after demanding a full explanation from Ocwen concerning the letter-backdating issue disclosed in the October 21, 2014 Letter, Ocwen represented, among other things, that the issue was "limited to its REALServicing platform because FiServ letters are processed differently."

218.   On December 22, 2014, the Company filed a Form 8-K with the SEC stating that on December 19, 2014, Ocwen reached a settlement with the NY DFS related to its recent investigation and entered into a Consent Order pursuant to New York Banking Law §44 ("2014 Consent Order") with the NY DFS to reflect such

settlement.  Pursuant to the terms of the 2014 Consent Order, Ocwen agreed to do

the following:

### *Settlement Summary of Monetary Provisions*

- Ocwen will pay a civil monetary penalty of $100 million to the NY DFS by December 31, 2014, which will be used by the State of New York for housing, foreclosure relief and community redevelopment programs;

- Ocwen will also pay $50 million as restitution to current and former New York borrowers in the form of $10,000 to each borrower whose home was foreclosed upon by Ocwen between January 2009 and December 19, 2014, with the balance distributed equally among borrowers who had foreclosure actions filed, but not completed, by Ocwen between January 2009 and December 19, 2014.

### *Settlement Summary of Non-Monetary Provisions*

*Borrower Assistance*

Beginning 60 days after December 19, 2014, and for two years, Ocwen will:

- Provide upon request by a New York borrower a complete loan file at no cost to the borrower;

- Provide every New York borrower who is denied a loan modification, short sale or deed-in-lieu of foreclosure with a detailed explanation of how this determination was reached; and

- Provide one free credit report per year, at Ocwen's expense, to any New York borrower on request if Ocwen made a negative report to any credit agency from January 1, 2010, and Ocwen

will make staff available for borrowers to inquire about their credit reporting, dedicating resources necessary to investigate such inquiries and correct any errors.

*Operations Monitor*

- The NY DFS will appoint an independent Operations Monitor to review and assess the adequacy and effectiveness of Ocwen's operations. The Operation Monitor's term will extend for two years from its engagement, and the NY DFS may extend the engagement another 12 months at its sole discretion;

- The Operations Monitor will recommend and oversee implementation of corrections, and establish progress benchmarks when it identifies weaknesses;

- The Operations Monitor will report periodically on its findings and progress. The currently existing monitor will remain in place for at least three months and then for a short transitional period to facilitate an effective transition to the Operations Monitor.

*Related Companies*

- The Operations Monitor will review and approve Ocwen's benchmark pricing and performance studies semi-annually with respect to all fees or expenses charged to New York borrowers by any related party;

- Ocwen will not share any common officers or employees with any related party and will not share risk, internal audit or vendor oversight functions with any related party;

- Any Ocwen employee, officer or director owning more than $200,000 equity ownership in any related party will be recused from negotiating or voting to approve a transaction with the

related party in which the employee, officer or director has such equity ownership, or any transaction that indirectly benefits such related party, if the transaction involves $120,000 or more in revenue or expense.

*Corporate Governance*

- Ocwen will add two independent directors who will be appointed after consultation with the Monitor and who will not own equity in any related party;

- As of January 16, 2015, William C. Erbey will step down as an officer and director of Ocwen, as well as from the boards of Ocwen's related companies;

- The Operations Monitor will review Ocwen's current committees of the Board of Directors and will consult with the Board relating to the committees. This will include determining which decisions should be committed to independent directors' oversight, such as approval of transactions with related parties, transactions to acquire mortgage servicing rights, sub-servicing rights or otherwise to increase the number of serviced loans, and new relationships with third-party vendors;

- The Board will work closely with the Operations Monitor to identify operations issues and ensure that they are addressed. The Board will consult with the Operations Monitor to determine whether any member of senior management should be terminated or whether additional officers should be retained to achieve the goals of complying with this Consent Order.

*MSR Purchases*

- Ocwen may acquire mortgage servicing rights ("MSRs") upon (a) meeting benchmarks specified by the Operations Monitor relating to Ocwen's onboarding process for newly acquired MSRs and its ability to adequately service newly acquired

140

MSRs and its existing loan portfolio, and (b) the NY DFS's approval, not to be unreasonably withheld;

- These benchmarks will address the compliance plan, a plan to resolve record-keeping and borrower communication issues, the reasonableness of fees and expenses in the servicing operations, development of risk controls for the onboarding process, and development of a written onboarding plan assessing potential risks and deficiencies in the onboarding process.

219.   In a December 22, 2014 press release issued by the NY DFS announcing the settlement, the NY DFS summarized its investigation of Ocwen's misconduct as follows:

### NYDFS' Investigation of Ocwen's Misconduct

Ocwen is currently the fourth largest mortgage loan servicer and the largest servicer of subprime loans in the United States, servicing an unpaid principal balance ("UPB") of approximately $430 billion.

Ocwen has grown more than ten-fold in the last several years. Beginning in 2009, Ocwen significantly expanded its servicing operations through the acquisition of several major servicers of home loans, as well as the acquisition of mortgage servicing rights (MSRs) for hundreds of billions of dollars in UPB.

In 2010 and 2011, NYDFS participated in a multistate examination of Ocwen, as well as entities ultimately acquired by Ocwen. The examination of Ocwen identified, among other things, deficiencies in Ocwen's servicing platform and loss mitigation infrastructure, including (a) robo-signing, (b) inaccurate affidavits and failure to properly validate document execution processes, (c) missing documentation, (d) wrongful

foreclosure, (e) failure to properly maintain books and records, and (f) initiation of foreclosure actions without proper legal standing.

Accordingly, Ocwen and NYDFS entered into an Agreement on Mortgage Servicing Practices on September 1, 2011. In June 2012, the Department conducted a surprise examination of Ocwen to assess its compliance with the 2011 Agreement, and uncovered significant violations. Consequently, on December 5, 2012, Ocwen entered into a Consent Order with NYDFS, which required Ocwen to retain an independent compliance monitor for two years.

During the course of the Monitor's review, it identified numerous and significant additional violations of the 2011 Agreement, as well as New York State laws and regulations. For example, a limited review by the Monitor of 478 New York loans that Ocwen had foreclosed upon revealed 1,358 violations of Ocwen's legal obligations, or about three violations per foreclosed loan. These violations included:

- failing to confirm that it had the right to foreclose before initiating foreclosure proceedings;
- failing to ensure that its statements to the court in foreclosure proceedings were correct;
- pursuing foreclosure even while modification applications were pending ("dual tracking");
- failing to maintain records confirming that it is not pursuing foreclosure of servicemembers on active duty; and failing to assign a designated customer care representative.

The Department and the Monitor also identified, among other issues, (a) inadequate and ineffective information technology systems and personnel, and (b) widespread conflicts of interest with related parties.

142

In the course of its review, the Monitor determined that Ocwen's information technology systems are a patchwork of legacy systems and systems inherited from acquired companies, many of which are incompatible. A frequent occurrence is that a fix to one system creates unintended consequences in other systems. As a result, Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records.

Ocwen's core servicing functions rely on its inadequate systems. Specifically, Ocwen uses comment codes entered either manually or automatically to service its portfolio; each code initiates a process, such as sending a delinquency letter to a borrower, or referring a loan to foreclosure counsel. With Ocwen's rapid growth and acquisitions of other servicers, the number of Ocwen's comment codes has ballooned to more than 8,400 such codes. Often, due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function.

Despite these issues, Ocwen continues to rely on those systems to service its portfolio of distressed loans. Ocwen's reliance on technology has led it to employ fewer trained personnel than its competitors. For example, Ocwen's Chief Financial Officer recently acknowledged, in reference to its offshore customer care personnel, that Ocwen is simply "training people to read the scripts and the dialogue engines with feeling." Ocwen's policy is to require customer support staff to follow the scripts closely, and Ocwen penalizes and has terminated customer support staff who fail to follow the scripts that appear on their computer screens. In some cases, this policy has frustrated struggling borrowers who have complex issues that exceed the bounds of a script and have issues speaking with representatives at Ocwen capable of addressing their concerns. Moreover, Ocwen's

customer care representatives in many cases provide conflicting responses to a borrower's question. Representatives have also failed in many cases to record in Ocwen's servicing system the nature of the concerns that a borrower has expressed, leading to inaccurate records of the issues raised by the borrower.

The Department's review of Ocwen's mortgage servicing practices also uncovered a number of conflicts of interest between Ocwen and four other public companies (the aforementioned "related companies"), all of which are chaired by Mr. Erbey, who is also the largest individual shareholder of each and the Executive Chairman of Ocwen.

Despite Mr. Erbey's holdings in these companies, Mr. Erbey has not in fact recused himself from approvals of several transactions with the related parties. Mr. Erbey, who owns approximately 15 percent of Ocwen's stock, and nearly double that percentage of the stock of Altisource Portfolio, has participated in the approval of a number of transactions between the two companies or from which Altisource received some benefit, including the renewal of Ocwen's forced placed insurance program in early 2014.

Ocwen's close business relationship with related companies is particularly evident in its relationship with Altisource Portfolio, which has dozens of subsidiaries that perform fee-based services for Ocwen. In one example, Altisource Portfolio subsidiary Hubzu, an online auction site, hosts nearly all Ocwen auctions. In certain circumstances, Hubzu has charged more for its services to Ocwen than to other customers — charges which are then passed on to borrowers and investors. Moreover, Ocwen engages Altisource Portfolio subsidiary REALHome Services and Solutions, Inc. as its default real estate agency for short sales and investor-owned properties, even though this agency principally employs out-of-state agents who do not perform the onsite work that local agents perform, at the same cost to borrowers and investors.

144

> Conflicts of interest are also evident at other levels of the Ocwen
> organization. For example, during its review, the Monitor
> discovered that Ocwen's Chief Risk Officer concurrently served
> as the Chief Risk Officer of Altisource Portfolio. The Chief Risk
> Officer reported directly to Mr. Erbey in both capacities. This
> individual seemed not to appreciate the potential conflicts of
> interest posed by this dual role, which was of particular concern
> given his role as Chief Risk Officer.

220. In the December 22, 2014 Form 8-K, the Company also disclosed that on December 19, 2014, defendant Erbey notified the Board of his decision to step down as Executive Chairman and as a member of the Board effective as of January 16, 2015. Defendant Wish assumed the role of non-executive Chairman on January 16, 2015.

221. On January 20, 2015, the Company filed a Form 8-K with the SEC announcing that on January 16, 2015, Defendant Erbey stepped down as the Executive Chairman and as a member of the Board. Additionally, Erbey stepped resigned as a director, officer and employee of Ocwen Mortgage Servicing, Inc., Altisource, AAMC, Residential and HLSS.

222. On January 21, 2015, the Company filed a Form 8-K with the SEC disclosing that on January 20, 2015, the Board appointed Phyllis R. Caldwell and DeForest Blake Soaries, Jr. to serve as directors on the Board until the Company's

next annual meeting of stockholders and until their respective successors are duly elected and qualified. The Form 8-K also disclosed that Ms. Caldwell and Mr. Soaries were appointed pursuant to the terms of the 2014 Consent Order.

223. Despite Ocwen's repeated assurances to the public that it was cooperating with the NY DFS during its investigation into the Company's business, it was not long before Ocwen found itself in trouble with another regulatory agency.

224. On January 26, 2015, the Company filed a Form 8-K with the SEC announcing that on January 23, 2015, Ocwen Loan Servicing, LLC, a wholly owned subsidiary of the Company, reached an agreement with the California Department of Business Oversight ("CA DBO") which will result in the CA DBO withdrawing its notice of hearing to suspend Ocwen's license in California. Ocwen and the CA DBO entered into a consent order whereby Ocwen agreed to pay the CA DBO a penalty in the amount of $2.5 million plus their costs associated with the examination within ten days of the effective date of the consent order. Ocwen also agreed to cease acquiring any additional MSRs for loans secured in California until the CA DBO is satisfied that Ocwen can satisfactorily respond to the requests for information and documentation made in the course of a regulatory exam. Further, the CA DBO will select an independent third party auditor ("Auditor") to assess

Ocwen's compliance with laws and regulations impacting California borrowers for an initial term of 2 years, extendable at the discretion of the CA DBO.  Ocwen agreed to pay all reasonable and necessary costs of the Auditor.  The Auditor will report periodically on its findings and progress and Ocwen will submit to the CA DBO a written plan to address and implement corrective measures and address any deficiencies identified by the Auditor.

225.   On February 5, 2015, approximately 10 days after the announcement of the CA DBO settlement, Ocwen issued a press release whereby defendant Faris addressed the Company's recent regulatory issues and reiterated the Company's commitment to a culture of integrity, transparency and accountability.  The press release stated the following:

Important stakeholders,

> Much has taken place around Ocwen since our call in late December. I thought it would be helpful to provide an update on the company and to provide answers, context and facts around many of the questions that are on people's minds.

> In my remarks today, I would like to address 4 broad topics.  Those topics are:

> 1.   An update on the regulatory front
> 2.   Fourth quarter 2014 significant items
> 3.   An update on liquidity

147

    4.     the status of our non-agency RMBS servicing

First on the regulatory front:

- Regulatory examinations by state regulators are part of our ordinary course business activities. During 2014, state regulators commenced 46 examinations of one or more of our areas of operation, and we closed 25 exams involving 19 states (some of which had started in prior years).

- As of December 31, 2014 we are aware of 21 pending examinations in a total of 15 states. We also regularly engage with our state regulators to respond to specific inquires or investigations, in many cases relating to individual borrower complaints that they have received.

- Based on our current engagement with state regulators, we are not aware of nor do we anticipate any material fines, penalties or settlements, although we do expect to resolve two open legacy matters for a total of less than $1 million.

- In addition to the above, in December 2014 and January 2015, we entered into 2 state consent orders (New York and California) relating to or emanating from regulatory exams and oversight. Applicable law and regulations generally prohibit the company from discussing the results of state licensing reviews and examinations.

- Beyond the examinations I just mentioned, we are not aware of any pending or threatened state licensing actions.

- Other than the ongoing monitoring of our National Mortgage Settlement, we are not currently aware of any material investigations of Ocwen by State Attorneys General. We remind

148

you that we entered into the National Settlement in December 2013 with the CFPB and 49 State AGs. Our National Mortgage Settlement also included releases from past servicing practices for Ocwen, Homeward and Litton from most all state regulators.

On the federal level:

- We are subject to supervision by the CFPB.  Just as with the state regulators, applicable law and regulations prohibit the Company from public disclosures of any open or pending regulatory CFPB reviews or examinations so naturally we can't make those.

- On the National Mortgage Settlement front, although we do not have the final results of the retesting of certain 2014 metrics by the National Monitor overseeing compliance, we do expect that, similar to many other Servicers in 2014, we will have metrics that will require remediation through corrective action plans as defined by the settlement.

- In addition, we estimate, that through December 31, 2014 we have already completed approximately $1.7 billion of our $2 billion principal reduction commitment under our National Mortgage Settlement, and we remain committed to helping struggling families. All of these modifications were completed in accordance with the underlying servicing agreements.

- We continue to be the leader in executing on net present value investor positive modifications that are appropriate and more sustainable for borrowers than those offered by certain other industry participants. We are responsible for 20% of all HAMP modifications industry-wide, and we have completed approximately 42% more modifications than the next best servicer.

- Fannie Mae, Freddie Mac and GNMA are important clients of Ocwen, and we work closely with them on strategies to improve our servicing. They have been highly cooperative in our strategies to sell some of our GSE MSR assets, which I will discuss further later.

Secondly, I would next like to highlight certain significant items that are expected to impact our fourth quarter 2014 results.

- We will be recording an additional $50 million expense related to our NY Settlement in the fourth quarter of 2014, since we reserved for $100 million in the third quarter of 2014 in accordance with GAAP and based on information available at the time we finalized our third quarter financial statements.

- Through the third quarter of 2014 we had recorded $66 million in expenses related to uncollectable receivables and other servicing expenses. We expect to increase this amount in the fourth quarter by approximately $64 million. We ended the year with approximately $85 million of reserves against Corporate advances, a coverage ratio of 13%. We anticipate that the level of these types of expenses will decrease significantly in 2015 as we have substantially cleared out legacy issues related to acquisitions and other servicing transfers.

- Through the third quarter of 2014 we had recorded third party monitor expenses of approximately $27 million. We expect the expense for third party monitoring costs in the fourth quarter of 2014 to be approximately $13 million.

- As a result of the items just discussed and other fourth quarter events, we expect to record a loss in the fourth quarter of 2014 and for the total year. Additionally, given the mix of on-shore

150

and off-shore results, and the fact that the NY DFS payment is not tax deductible, we will have a negative tax rate for the year.

Third, regarding our liquidity:

- We believe that we are currently in good standing with all of our outstanding debt agreements, including our Senior Secured Term Loan.

- We entered into one new revolving advance financing line with a large bank in late December for $125 million, representing new funds backed by advances from private label securities.

- In 2014, we generated significant normalized adjusted cash flow from operations, which is the non-GAAP metric we presented in our third quarter earnings presentation.  For those interested in additional detail on our normalized adjusted cash flow from operations for the first three quarters of 2014, I refer you to our third quarter earnings presentation which is posted on our website.  Although in 2015 our portfolio is smaller and our compliance, regulatory and professional fee expenses will remain elevated, we expect to continue to generate significant positive normalized adjusted cash flow from operations.

- In January we voluntarily closed a small, largely unused advance financing line for some of our commercial servicing advances.

- We had a technical default in some of our origination warehouse lines in January and received the appropriate waivers on all associated defaults. We do not believe we were or currently are in default on our term loan or unsecured bonds.

- Since we made our $150 million cash payment to the NY DFS on December 31st, 2014, we have we have had an average daily cash balance of over $175 million.

- As of the end of the day on February 3, 2015, we had $249 million in cash, and our cash forecast indicates that we will continue to have sufficient liquidity going forward.

- In addition, as we have previously indicated, we are working on a series of transactions to sell portions of our GSE Mortgage Servicing rights. Starting in the second quarter, and possibly earlier, we expect to start closing on transactions. We anticipate sales of $5 to $20 billion of UPB per month through the end of the year, although we have not ruled out larger transactions if they are available for execution at attractive levels. Of course, no sales are guaranteed until they are actually executed. However, we have received strong interest from many eligible buyers.

- Proceeds from the sales of MSRs should be substantial and could be used to fund existing assets, invest in new assets or repay portions of our Senior Secured Term loan.

- We do expect to see a reduction in leverage as a result of these MSR sales, assuming we complete sales along the lines we anticipate. We also anticipate that MSR sales will result in net gains, and they will significantly reduce our exposure to changes in interest rates and pre-payment speeds. They will also help simplify our operating structure.

- We do not currently expect to restart our buy-back of stock, though we retain the ability to revisit this as circumstances change, and as we return to profitability.

152

- Although not obligations of Ocwen, we have been in contact with Home Loan Servicing Solutions, and we believe that they will continue to be able to fund future advances on sale transactions we executed with them over the past few years. As has already been publicly disclosed, both Ocwen and HLSS have refuted claims of default made by a purported holder of certain HLSS advance financing notes who admits it is pursuing a strategy of shorting Ocwen's stock.

- Ocwen has also responded, through legal counsel, to a notice of default submitted by a lawyer claiming to represent various investors in 119 mortgage pools serviced by Ocwen, constituting only approximately 2% of Ocwen's total servicing portfolio or $9 billion in UPB. As noted in our counsel's response, many of these claims were previously asserted in a failed attempt by these same investors to block a previous servicing transfer to Ocwen. At that time, after thorough review by an independent mortgage servicing expert firm hired by trustees, that transfer was permitted to proceed. We believe the claims raised again now are likewise without merit and, as before, asserted as part of an ill-conceived but quite transparent campaign by these particular investors to stop loan modifications and instead foreclose and evict as many struggling homeowners as quickly as possible. Such knee-jerk foreclosures may advance the special economic interests of these complaining investors; however, we believe they are neither in the economic best interests of the trusts as a whole nor consistent with well-established industry practice, and therefore not permitted under our servicing contracts. We are reviewing these claims in detail and intend to vigorously defend ourselves against these and any similar investor and/or bondholder claims. We would highlight that settlements of similar claims between these investors and some of the big banks have resulted in restrictions on loan modifications, especially those that include principal reductions.

153

We believe that settlements of this sort are not in the best interest of all RMBS investors, are bad for consumers and are against good public policy.

- We are focused on working with our existing lenders and other lenders to extend the terms of our advance financing lines that mature later this year. Although there have been some contractions in the availability of advance financing across the industry and there are no guarantees, we believe that there is still ample liquidity in the marketplace to allow Ocwen, HLSS and other servicers to continue to fund servicing advances at reasonable terms. Advances remain one of the most safe, secure and stable asset backed receivables in the market place.

- In order to continue operating in a safe and sound manner and to maximize shareholder returns, we will continue to examine and adjust our capital structure as appropriate.  To assist us in this process, including extending the terms of our advance financing sources maturing later this year, we intend to hire two financial advisors with significant experience in asset backed financing, capital markets, corporate and mortgage finance.

- We have also reviewed the recently proposed new Federal Housing Finance Agency (FHFA) capital and liquidity standards, and we believe that we are currently well inside the proposed limits. We welcome these standards, as they provide greater certainty and stability to the servicing markets. We remain the best capitalized of the large non-bank servicers.

And finally, I would now like to turn your attention to the status of our existing non-agency RMBS servicing portfolio:

- We are currently a servicer on approximately 4,000 private label securities (PLS) agreements.

- Of these, approximately 695 with about $44.8 billion of UPB have minimum Servicer Ratings criteria.

- While rating agencies have taken actions largely based on public information regarding issues with regulators, they have not pointed to actual servicing performance deficiencies. For example, the Fitch action of February 4th, 2015 starts by noting that "the company continues to perform servicing functions at a proficient level." Objective data on PLS performance continues to show that Ocwen excels in managing loss mitigation timelines, bringing borrowers current on their payments and keeping them current. For these reasons, we believe it is in the best interests of all stakeholders to continue to keep Ocwen on the job.

- To date, including the recent announcement from Fitch, our servicer ratings have fallen below the minimum criteria set forth in 482 PLS agreements. This represents approximately $34.6 billion in UPB serviced by Ocwen, or 8.7% of our total servicing portfolio.

- We have not been notified by any RMBS trustee of any intent to move Non-Agency RMBS servicing as a result of changes in servicer ratings or any other reason.

- We believe our performance on Ocwen-serviced pools, as calculated by BlackBox Logic data for subprime Non-Agency securities, is evidence of our PLS servicing strength. As communicated previously, Ocwen outperforms other servicers by almost 10 percentage points in the percentage of subprime PLS loans that have made 10 or more payments in the prior 12 months. Similarly, the percentage of borrowers who have made

all 12 payments in the last 12 month is 10 percentage points higher.

- Despite the recent challenges around the company, and despite the fact that more trusts have the option to transfer servicing today than did yesterday, we believe, consistent with our past experiences, that trustees and bondholders will look to our cash generation outperformance and act in their economic best interest in deciding not to exercise their right to transfer servicing.

- That said, there is no guarantee that Trustees and Bondholders will not decide to transfer servicing. Should that occur, we believe that any forced transfer of servicing would result in accelerated recovery of advances outstanding, would not be in the best interest of the RMBS trusts as a whole and would be disruptive and potentially harmful to consumers whose loans would be affected.

- Lastly on the RMBS front, we still anticipate entering into at least one RMBS Call Rights transaction in Q1 2015 and more throughout 2015.

Management and our board of directors are committed to becoming a better company and servicer. I think you will agree that our two newly appointed board members highlight this commitment and show confidence in the company's future. We are focused both on results and how we achieve those results in a responsible and compliant manner. We are committed to a culture of integrity, transparency and accountability. We continue to learn from and improve from the challenges we have faced. We look forward to working with all stakeholders, including Shareholders, Consumers, Non-profit partners, Government, Regulators, Loan Investors, Employees and Lenders as

we move forward. Working together we can continue to change lives by helping homeowners in all that we do.

If there is any doubt that Ocwen is changing lives through its work, I will close by sharing with you one of the many positive letters we receive. This letter was received from one of our California customers two weeks ago.

Quote:

*"Dear Sir,*

*First of all, My family and I are extending our heartfelt "Thank you very much" for giving and sharing your kindness, help and approval for the loan modification. Your kindness with my family had brought us to have a place to live and stay comfortable and warm during this winter cold season. Thank you too for your wonderful holiday season's greeting. We appreciate it very much. May the good Lord Bless you.*

*We will assure you that we will keep on time managing and paying our monthly mortgage.*

*Respectfully,*
*Helen"*

226.   Approximately one month later, on March 2, 2015, the Company

issued a press release updating shareholders on its fourth quarter 2014 financial

results.  The press release stated the following:

**Atlanta, GA (March 2, 2015) - Ocwen Financial Corporation, "Ocwen" or the "Company", (NYSE: OCN),** a leading financial services holding company, today reported significant updates about the Company.

As previously disclosed on February 5, 2015 in its Company Update to Stakeholders, Ocwen expects to report a loss for the fourth quarter and 2014 fiscal year.

In that Form 8-K filing, the Company disclosed the following items related to its fourth quarter results.

- It recorded an additional $50 million expense related to its New York Department of Financial Services Settlement.

- The Company expects to increase expenses related to uncollectable receivables and other servicing expenses by approximately $64 million.

- The Company expects the expense for third party monitoring costs in the fourth quarter of 2014 to be approximately $13 million.

In addition to these previously disclosed items, the Company anticipates that its fourth quarter results will be impacted by the following non-recurring items:

- A $370 – $420 million non-cash charge to write-off goodwill.

- The creation of a $15 million reserve relating to its remediation plan to address issues around certain erroneously dated borrower correspondence.

The above financial data is preliminary, based upon the Company's estimates and subject to completion of the Company's financial closing procedures. Moreover, this data has been prepared on the basis of currently available information. The Company's independent registered public accounting firm has not audited or reviewed, and does not express an opinion with respect to, this data. This data does

not constitute a comprehensive statement of the Company's financial results for the year ended December 31, 2014, and the Company's final numbers for this data may differ materially from these estimates.

Ocwen will file a Form 12b-25 with the U.S. Securities and Exchange Commission for an extension of time enabling the Company to file its 2014 Form 10-K on or before March 17, 2015, without penalty. Ocwen requires this extension to complete its goodwill valuation analysis and its financial closing procedures and to ensure appropriate disclosure of various recent events impacting the Company.

Upon finalizing fourth quarter and full year 2014 results the Company expects to host a call with the investment community.

### 2015 Other Events and Updates

So far in 2015, the Company has been executing on its previously announced plans to sell certain assets, reduce interest rate risk and further improve liquidity. Steps include:

- On March 2, 2015 the Company entered into an amendment to its $1.3 billion Senior Secured Term Loan (SSTL) to remove certain restrictions on asset sales and permanently increase a financial covenant. Ocwen has agreed to an accelerated repayment schedule for cash received from asset sales. "We are pleased with the actions of our term loan investors. They have been supportive of Ocwen and recognize the importance and benefit of executing on our strategy. Additionally, their willingness to enter into an amendment with Ocwen is an affirmation that the Company is, and always has been, in compliance with all of its SSTL covenants." said Ronald M. Faris, President and Chief Executive Officer of Ocwen.

- The Company signed a letter of intent with a buyer on the sale of mortgage servicing rights (MSRs) on a portfolio consisting of

159

approximately 277,000 performing Agency loans owned by Fannie Mae with a total unpaid principal balance of approximately $45 billion. Subject to a definitive agreement, approvals by Fannie Mae and FHFA and other customary conditions, Ocwen expects the transaction to close by mid-year and the loan servicing to transfer over the course of the second half of 2015.

- Including its previously announced $9.8 billion MSR sale to Nationstar, Ocwen is on track to sell Agency MSRs relating to approximately $55 billion of unpaid principal balance in the next six months for prices significantly above its estimated carrying value at December 31, 2014. Ocwen currently anticipates that these transactions will generate approximately $550 million of proceeds over the next six months and accelerate Ocwen's strategy to reduce the size of its Agency servicing portfolio.

- Ocwen awarded a sale of non-performing and performing loan assets to an undisclosed buyer. The transaction is subject to typical closing conditions, including finalizing due diligence and a definitive agreement. Total proceeds are expected to be approximately $40 million, and the Company expects the transaction to close by the end of March.  The book value of the assets is approximately $26 million.

- On February 27, 2015, the Company entered into an agreement with a global financial institution to provide replacement financing on Ocwen's $450 million OFSART servicing advance facility should the existing lender seek not to refinance the facility upon its maturity in June 2015. This agreement is subject to definitive documentation and other customary funding conditions.

In its Company Update to Stakeholders on February 5, 2015, Ocwen provided numerous updates on the Company. Below are a number of additional updates:

- Based on Ocwen's current engagements with state regulators, the Company is not aware of nor anticipating any material fines, penalties or settlements. Ocwen still expects to resolve two open legacy matters for a total of less than $1 million. Ocwen is not aware of any pending or threatened actions to suspend or revoke any state licenses.

- Since January 1, 2015, Ocwen has had an average daily cash balance of over $215 million and continues to forecast that it will have sufficient liquidity going forward.

- Ocwen believes that the SSTL amendment shows that there is no event of default and there has not been any event of default under Ocwen's SSTL. Ocwen has publicly refuted a number of times the allegations made by a purported noteholder of certain Home Loan Servicing Solutions advance financing notes which admits it is pursuing a strategy of shorting Ocwen's stock. Ocwen continues to vigorously defend itself against the claims of this short seller.

- In addition to the $55 billion in transactions noted above, the Company continues to look at additional asset sales and plans to complete other small or large transactions throughout the year.

- The Company no longer expects to execute its first call rights transaction in the first quarter of 2015, but it still anticipates closing call right transactions in the year. In the near-term, we believe this strategy will still generate positive gains for the Company, although they are likely to be lower than initially forecasted.

- On February 27, 2015, Ocwen commented on its receipt of two notices that would terminate the Company as the servicer of two private label RMBS trusts relating to 0.07% of Ocwen's overall servicing portfolio. These two trusts were part of the 119 transactions referenced in the February 5, 2015 Company Update to Stakeholders. We anticipate that these terminations will result in a $0.5 million gain for Ocwen as the recovery of deferred servicing fees will more than offset the loss of the servicing asset. The Company has also learned that the same trustee concluded its voting process for at least one other RMBS trust (of the 119) and in that case, the certificateholders elected to retain Ocwen as the servicer.

- Ocwen has hired Moelis & Company and Barclays Capital Inc. to support the Company and to advise regarding adjustments to its capital structure, as appropriate. Additionally these advisors are helping the Company explore its strategic options.

227.   Therefore, as a result of the Individual Defendants' wrongdoing, Ocwen has been forced to sell off billions of dollars of its assets to try to right itself.

228.   Finally, on March 18, 2015, Ocwen filed a Form 8-K with the SEC disclosing the following:

Ocwen Financial Corporation ("the Company") expects that it will file its Annual Report on Form 10-K for the fiscal year ended December 31, 2014 on or before Monday, March 23, 2015, but there can be no assurance that it will be able to do so. The Company continues to analyze and review Home Loan Servicing Solutions, Ltd.'s ("HLSS") ability to continue to meet its obligations to fund new servicing advances. A failure by HLSS to fund new

serving advances could have a material negative impact on the Company's financial condition. Additionally, the Company is clarifying for its auditor the appropriateness of adding back the $150 million New York Department of Financial Services charge as an extraordinary item for certain covenant calculations in one of its advance financing facilities (OMART).

229.   On March 23, 2015 the Company announced that, on March 18, 2015, the Company received a deficiency letter from New York Stock Exchange Regulation, Inc. indicating that the Company was not in compliance with the continued listing standards of the New York Stock Exchange as a result of its failure to timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2014. The Company was also unable to provide an expected date on which it plans to file its Annual Report.

### DAMAGES TO OCWEN CAUSED BY THE INDIVIDUAL DEFENDANTS

230.   As a direct and proximate result of the Individual Defendants' misconduct, Ocwen failed to maintain proper internal accounting controls, caused the Company to release false and misleading statements, allowed Defendant Erbey to engage in self-dealing and to personally profit by causing the Company to enter into multiple transactions with his affiliated companies at the expense of Ocwen shareholders, caused the Company to incur millions of dollars in penalties and

placed the Company at a competitive disadvantage due to the extra layer of rules Ocwen must now abide by that other mortgage servicers are not constrained by, and substantially damaged the Company's credibility, corporate image and goodwill.

231.   Ocwen has expended and will continue to expend significant sums of money. Additional expenditures and damages that the Company has incurred as a result of the Individual Defendants' breaches of their fiduciary duty include:

a.   Costs and expenses incurred from investigating, defending and paying any settlement or judgment in the Securities Class Action for violations of federal securities laws;

b.   The costs and expenses incurred by the Company in connection with defending itself against the multiple government investigations including, but not limited to, the $150 million fine for the NY DFS settlement and the $2.5 million penalty with the CA DBO;

c.   The millions of dollars in unjustified fees Ocwen paid to the Ocwen Affiliates owned by defendant Erbey, particularly Altisource, that was the result of defendant Erbey's self-dealing transactions as described herein; and

d.   Costs incurred from the loss of Ocwen's customers' confidence in the Company's services.

232.   Furthermore, Ocwen has already admitted that it has to restate its previously filed financial statements for Fiscal Year 2013 and the first quarter of 2014.  A restatement will subject the Company to significant costs in the form of accounting, legal, and similar professional fees, in addition to the substantial diversion of time and attention of the Company's CFO, other officers and directors and members of the Company's accounting department in preparing and reviewing the restatement.  Any such restatement could also adversely affect the Company's business, its ability to access the capital markets and the market price of Ocwen's common stock.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

233.   Plaintiff brings this action derivatively in the right and for the benefit of Ocwen to redress injuries suffered, and to be suffered, by Ocwen as a direct result of breaches of fiduciary duty, waste of corporate assets and unjust enrichment.

234.  Plaintiff will fairly and adequately represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

235.  Ocwen is named as a nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this

Court that it would not otherwise have. Plaintiff is and was a shareholder of Ocwen at the time of the transgressions complained of. Plaintiff will adequately and fairly represent the interests of Ocwen and its shareholders in enforcing and prosecuting their rights. Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

236.   The wrongful acts complained of herein subject, and will continue to subject, Ocwen to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

237.   The wrongful acts complained of herein were unlawfully concealed from Ocwen's shareholders.

238.   Throughout the Relevant Period, the Individual Defendants violated multiple corporate governance principles, thus representing evidence of the Individual Defendants' breaches of fiduciary duties. The course of action related misrepresenting the financial integrity of the Company, and caused the Individual Defendants to breach the following corporate principles, among others:

   a.   directors, officers and employees owe a duty to the Company to advance
        its legitimate interests when the opportunity to do so arises and may not

take for themselves, opportunities that are discovered through the use of

corporate property, information or position for personal gain;

b. deal fairly with the Company's customers/clients, suppliers, competitors,

directors and employees and must never take unfair advantage of others

through manipulation, concealment, abuse of privileged information,

misrepresentation of material facts or any other unfair dealing practice;

c. comply with United States generally accepted accounting principles at all

times;

d. maintain books and records that accurately and fairly reflect the

Company's transactions; and

e. maintain a system of internal controls that will provide reasonable

assurances to management that material information about the Company

is made known to management, particularly during the periods in which

the Company's periodic reports are being prepared.

**Plaintiff Has Made Pre-Suit Demand Pursuant To Rule 23.1 and the Florida Business Corporation Act, § 607.07401**

239.   On June 3, 2014, Plaintiff made the June Demand on the Board to

commence an action against the Individual Defendants.   A copy of the June

Demand is attached hereto as Exhibit A.   The June Demand letter and the allegations therein are incorporated herein by reference.

240.   Shortly after the June Demand, on August 7, 2014, Plaintiff's counsel received a phone call from Mr. Sean Coffey, Esq., of the law firm of Kramer Levin Naftalis & Frankel LLP, counsel for the Company and certain officers and directors in the Securities Class Action (hereinafter "Class Action Defense Counsel").  Class Action Defense Counsel advised Plaintiff's counsel that on August 7, 2014, the Board formed a SLC to investigate the allegations in the June Demand.

241.   Ultimately, after 90 days had passed with the Board taking no action to consider the claims set forth in the June Demand, on September 3, 2014, Plaintiff sent the Supplemental Demand in light of further information of wrongdoing that had been publicly disclosed since the June Demand.  The Supplemental Demand also requested certain limited SLC documentation so that Plaintiff could better understand the SLC formation process and ensure that that the SLC's investigation was both objective and independent. A copy of the Supplemental Demand from Plaintiff's counsel to Class Action Defense Counsel setting forth additional demands is attached hereto as Exhibit B.

242.   On September 9, 2014, Plaintiff's counsel received a letter from Class Action Defense Counsel stating that the allegations in the June Demand and the Supplemental Demand were referred to the SLC.

243.   On October 23, 2014, Plaintiff's counsel sent a second letter to Class Action Defense Counsel reiterating Plaintiff's requests for documentation in connection with the June Demand and the Supplemental Demand and inquiring whether the SLC had retained counsel so that Plaintiff's counsel could directly communicate with that firm for future correspondence.

244.   Having received no response to the October 23, 2014 letter, on December 12, 2014, Plaintiff's counsel sent a third letter to Class Action Defense Counsel advising him that Plaintiff made a litigation demand pursuant to Fla. Stat. §607.07401(2) and that pursuant to the statute more than ninety days had passed since the Demands were sent.   Additionally, Plaintiff raised the serious issue of Class Action Defense Counsel speaking on behalf of the SLC, stating:

> Furthermore, in both the September 3, 2014 demand letter and a letter dated October 22, 2104 letter, we reiterated our request for documentation regarding the formation of the Special Litigation Committee ("SLC") tasked with investigating the Demands, including all Board resolutions relating to the SLC and any actions the SLC has taken in its investigation. We have received no response to this request and in fact, have received no response to our simple request for the name of any firm the SLC has retained as counsel. *We note that you*

*represent the Company and the officers and directors named in the Demands, and your role in speaking for the SLC thus far raises serious concerns regarding whether the SLC is conducting its investigation and evaluation independently and objectively.*

(Emphasis added).  A copy of the December 12, 2014 letter is attached hereto as Exhibit C.

245.   On December 19, 2014, Plaintiff's counsel learned that the SLC had retained Samuel J. Salario, Jr., Esq. of the law firm Carlton Fields Jordan Burt, LLP as outside counsel ("SLC Counsel").  Accordingly, on January 6, 2015, Plaintiff's counsel sent a letter to SLC Counsel summarizing the previous communications between Plaintiff's counsel and Class Action Defense Counsel, reiterating the June Demand and the Supplemental Demand and advising SLC Counsel that more than 90 days have passed since the date of the June Demand.

246.   During a telephone conversation between Plaintiff's counsel and SLC Counsel that took place on January 9, 2015, SLC Counsel refused to provide Plaintiff's counsel with any of the SLC documents requested in the June Demand and the Supplemental Demand, stating that the production of SLC information was better addressed by Class Action Defense Counsel than with SLC Counsel. SLC Counsel failed to explain why Class Action Defense Counsel, who has an undivided

loyalty to the targets in the Demands, was better suited to discuss information regarding the SLC.

247.  Despite Plaintiff's counsel's numerous demands for limited SLC documentation to ensure that the SLC process is conducting its investigation objectively and independently, neither SLC Counsel nor anyone else on behalf of the Board has provided any of the requested information.  Refusal to produce such SLC documentation is unreasonable given that Plaintiff is merely attempting to ensure that the SLC investigation is reasonable, objective and independent so that the Company does not needlessly waste Company resources on an improper SLC.

248.  The SLC has failed to act in the best interests of the Company. The SLC has repeatedly allowed the Class Action Defense Counsel to speak on its behalf despite the fact that Class Action Defense Counsel represents the Company and certain officers and directors in the Securities Class Actions, and therefore owes a duty of undivided loyalty to the very parties that are the subject of Plaintiff's Demands.  As such, Class Action Defense Counsel's role in speaking for the SLC, a committee that it supposed to be comprised of independent and disinterested directors, constitutes a conflict of interest and raises serious doubts as to the SLC's ability to conduct an independent and objective investigation and evaluation.

249. On March 23, 2015, after patiently waiting in good faith for a conclusion to the SLC investigation to be rendered, Plaintiff received a letter from SLC Counsel announcing that no conclusion of the Demands was in sight and, even more importantly, the SLC's investigation of the Demands was being stopped altogether. A copy of the March 23, 2015 letter is attached hereto as Exhibit D. Specifically, despite the SLC being given the express authority to investigate the claims alleged in the Demands and to make decision on whether to proceed on Plaintiff's claims, the SLC has decided to "defer" reaching *any* decision regarding the Demands, halt its investigation of the Demands, and is unable to offer Plaintiff an end date for when a decision will even be reached. In other words, *ten months* after Plaintiff first sent the June Demand requesting that her claims against the Individual Defendants be investigated and damages against the Company be remedied, the only decision that has resulted is one of inexplicable deferment *with no end date of a conclusion even promised*. For instance, the March 23, 2015 letter states: "the Committee has determined that it will continue to monitor actively the Other Matters and will revisit its decision not to proceed with the claims as these matters proceed and when and if there is a material change in the litigation landscape against the Company." *See* Exhibit D at page 6.

172

250.   The Demands describe egregious misconduct by the Individual Defendants, and the fall out is affecting the Company's very own viability, as described herein. Plaintiff has the right to have the investigation into her Demands performed, and a conclusion provided, in a reasonable timeframe and manner so that the damages incurred by the Company can be appropriately remedied.  This dilatory tactic by the SLC, a failure to make a determination when it has expressly been given the authority to do so, is not, and could not possibly be in good faith. Accordingly, because the SLC has made the decision to "defer" making a conclusion, stop its investigation of the Demands and can give no definitive date for a conclusion, Plaintiff's Demands are deemed refused.

251.   Moreover, the March 23, 2015 letter also gave insight into an SLC process that raises serious concerns regarding its good faith and reasonableness. As outlined in the letter, a three person SLC was formed on May 14, 2014, comprised of two unnamed directors and defendant Lacy, who lacks the requisite independence and disinterestedness to properly act as an SLC member because he is explicitly implicated in the wrongdoing alleged in the Demands. Notably, ***nine months*** after the formation of the SLC and investigation of the Demands was initiated, the two unnamed directors were replaced with directors Phyllis R.

Caldwell ("Caldwell") and DeForest Black Soaries ("Soaries"). Thus, the three person SLC is currently comprised of one member, defendant Lacy, who was directly involved in the very claims he is responsible for investigating, and two other members, Caldwell and Soaries, who did not fully partake in the investigation of the Demands but according to the March 23, 2015 letter were merely "apprised" of the work performed. *See* Exhibit D at 2. These deficiencies in the SLC process are perhaps why Plaintiff was refused at every turn regarding her requests for SLC documentation, and preclude an inference of good faith on the part of the SLC and its now halted investigation.

252.   Therefore, for the reasons stated above, Plaintiff's Demands are deemed refused, the SLC has failed to act in good faith, and this action should be allowed to proceed forthwith.

## CAUSES OF ACTION

### COUNT I

**(Violations of §14(a) of the Exchange Act against Defendants Erbey, Faris, Korn, Lacy, Ross, Salcetti and Wish)**

253.   Plaintiff incorporates by reference and realleges each of the foregoing allegations  as though fully set forth herein.

254.  This claim for relief is not based on any allegations of knowing or reckless conduct by any defendant. This claim does not allege, and does not sound in fraud, and Plaintiff disclaims any reliance upon or reference to allegations of fraud.

255.  Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of ant security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. §  78l]."

256.  Rule 14a-9, promulgated pursuant to §  14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §  240.14a-9.

175

257.   Here, Ocwen's 2013 and 2014 Proxy Statements disseminated during the Relevant Period violated § 14(a) and Rule 14a-9 because they omitted material facts.  The 2013 and 2014 Proxy Statements were reviewed and issued by the Individual Defendants, and in the exercise of reasonable care, the Individual Defendants should have known that the 2014 and 2013 Proxy Statements were materially false and misleading.

258.   The misrepresentations and omissions in the 2013 and 2014 Proxy Statements were material and an essential link in the accomplishment of the continuation of the Individual Defendants' allowance of self-dealing transactions and the concealment of defendant Erbey's involvement in approving the self-dealing transactions involving the Ocwen Affiliates for the purpose of personally profiting off the related party transactions at the expense of Ocwen shareholders.

259.   The omissions and the false and misleading statements in the 2013 and 2014 Proxy Statements were material because a reasonable shareholder would have considered them important in deciding how to vote on the various matters set forth in the Proxy Statements for shareholder action. In addition, a reasonable shareholder would consider the omitted information as significantly altering the "total mix" of information made available in the Proxy Statement.

260.   The Company was damaged as a result of the material misrepresentations and omissions in the proxy statements.

## COUNT II

**(Against The Individual Defendants For Breach Of Fiduciary Duty)**

261.   Plaintiff incorporates by reference and realleges each of the foregoing allegations  as though fully set forth herein.

262.   The  Individual  Defendants  owed  and  owe  Ocwen  fiduciary obligations, including the obligations of good faith, fair dealing, loyalty  and care in the  management and administration of Ocwen's business and affairs. Among other things, the Individual Defendants owed a  fiduciary duty to Ocwen to ensure compliance  with  federal  and  state  consumer  financial  protection  laws  and regulations, to refrain from engaging in self-dealing transactions, and to supervise the issuance of Ocwen's  press releases  and  public filings and ensure they were truthful, accurate and conformed to federal and state securities laws.

263.   The Individual Defendants breached their fiduciary duties by:

a. Misrepresenting  the  Company's  business  operations  and  financial performance  condition  in  Form  10-Q's  and  Form  10-K's  and  other

documents filed with the SEC and thereby subjecting the Company to the Securities Class Actions and multiple government investigations;

b.  Allowing for materially inadequate controls over the Company's policies and practices and the effectiveness of the Company's financial reporting with respect to, among other things, the way Ocwen accounted for the sale of mortgage-servicing rights to related company HLSS;

c.  Participating in and/or allowing defendant Erbey to engage in self-dealing transactions at the expense of borrowers, mortgage investors, and/or Ocwen shareholders;

d.  Failing to comply with federal and state consumer protection financial laws and regulations and subjecting the Company to millions of dollars of penalties and fines and forcing the Company to adhere to additional more stringent consumer protection laws that other mortgage servicing companies are not constrained by;

e.  Allowing the Company's financial statements to be misrepresented and causing the Company's stock price to be artificially inflated;

f.  Allowing the Company to be downgraded by Moody's as both a primary
servicer of subprime residential mortgage loans and as a special servicer
of residential mortgage loans;

g.  Allowing the Company's securities to be at risk of delistment due to the
failure to timely file Ocwen's Form 10-K and Annual Report

264.   These actions were not a good-faith exercise of prudent business
judgment to protect and promote the Company's interests.

265.   By reason of the foregoing, Ocwen was damaged.

## COUNT III

### (Against the Individual Defendants for Waste of Corporate Assets)

266.   Plaintiff incorporates by reference and realleges each of the foregoing
allegations  as though fully set forth herein.

267.   Defendants breached their fiduciary duties by failing to properly
supervise and  monitor the adequacy of Ocwen's internal controls and by allowing
the Company to engage in an  illegal, unethical and improper course of conduct.

268.   As a result of the Individual Defendants' illicit course of conduct and
breaches of  fiduciary duty, the Company has incurred significant potential
liability for legal costs, penalties, fines, and/or legal fees in connection with the

defense of the Individual Defendants' unlawful course of conduct complained of herein.

269. The Individual Defendants also wasted corporate assets by repeatedly failing to comply with various federal and state consumer financial protection laws thus causing the Company to incur millions of dollars of fines and penalties.

270. The Individual Defendants further wasted corporate assets by approving and/or allowing the Company to engage in defendant Erbey's self-dealing transactions with the Ocwen Affiliates, which resulted in defendant Erbey improperly receiving numerous benefits and payments to the detriment of the Company and its shareholders.

271. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

272. By reason of the foregoing, Ocwen was damaged.

## COUNT IV

### (Against the Individual Defendants for Gross Mismanagement)

273. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

274.   By their actions alleged herein, the Individual Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Ocwen in a manner consistent with the operations of a publicly held corporation by:

a. Misrepresenting the Company's business operations and financial performance condition in Form 10-Q's and Form 10-K's and other documents filed with the SEC and thereby subjecting the Company to the Securities Class Actions and multiple government investigation;

b. Allowing for materially inadequate controls over the Company's policies and practices and the effectiveness of internal control over financial reporting with respect to, among other things, the way Ocwen accounted for the sale of mortgage-servicing rights to related company HLSS;

c. Participating in and/or allowing defendant Erbey to engage in self-dealing transactions at the expense of borrowers, mortgage investors, and/or Ocwen shareholders;

d. Failing to comply with federal and state consumer protection financial laws and regulations and subjecting the Company to millions of dollars of penalties and fines and forcing the Company to adhere to additional more

stringent consumer protection laws that other mortgage servicing companies are not constrained by;

e.  Allowing the Company's financial statements to be misrepresented and causing the Company's stock price to be artificially inflated; and

f.  Allowing the Company to be downgraded by Moody's as both a primary servicer of subprime residential mortgage loans and as a special servicer of residential mortgage loans.

275.  As a direct and proximate result of The Individual Defendants' gross mismanagement and breaches of duty alleged herein, Ocwen has sustained significant damages.

276.  As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT V

### (Against Defendant Erbey for Unjust Enrichment)

277.  Plaintiff incorporates by reference and realleges each of the foregoing allegations  as though fully set forth herein.

278.  Defendant Erbey has been unjustly enriched through his self-dealing transactions with the Ocwen Affiliates wherein he has managed to transfer wealth

from Ocwen and its shareholders to the Ocwen Affiliates and himself, and it would be unconscionable to allow him to retain the benefits of this illegal conduct.

279.   Plaintiff, as a shareholder of Ocwen, seeks restitution from defendant Erbey and seeks an order of this Court disgorging all profits, benefits, and other  compensation obtained by defendant Erbey, from his wrongful course of conduct and  fiduciary breaches.

280.   By reason of the foregoing, Ocwen was damaged.

## COUNT VI

### (Against the Individual Defendants for Aiding and Abetting Fiduciary Violations)

281.   Plaintiff incorporates by reference and realleges each of the foregoing allegations  as though fully set forth herein.

282.   The wrongful conduct alleged herein was continuous, connected, and on-going  since at least March 2013. The Individual Defendants' misconduct resulted  in continuous,  connected and on-going harm to the Company.

283.   The Individual Defendants had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including

the content of public statements disseminated by Ocwen and the Company's significant and systemic failure to comply with federal and state consumer financial protection laws, and had the power and/or ability to directly or indirectly control or influence one another.

284.   Each Individual Defendant is jointly and severally liable to the same extent as any other Defendant is liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

285.   As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Directing the Individual Defendants to account to Ocwen for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

B.   Directing Ocwen to take all necessary actions to reform its corporate governance and internal procedures to comply with applicable laws and protect the Company and its shareholders from a recurrence of the events described herein, including, but not limited to, a shareholder vote resolution for

184

amendments to Ocwen's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote on corporate governance policies;

C.     Awarding to Ocwen restitution from the Individual Defendants and ordering compelling defendant Erbey to disgorge to the Company the benefits he has received as a result of his self-dealing transactions;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

E.     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 27, 2015                     Respectfully submitted,


                                          */s/ David A. Bain*
                                          David A. Bain
                                          Georgia Bar No. 032449
                                          **LAW OFFICES OF DAVID A. BAIN,
                                          LLC**
                                          1050 Promenade II
                                          1230 Peachtree Street, NE
                                          Atlanta, Georgia 30309
                                          Telephone: 404-724-9990
                                          Facsimile: 404-724-9986
                                          dbain@bain-law.com

                                          *Liaison Counsel for Plaintiff*


                                          **FARUQI & FARUQI, LLP**
                                          Nadeem Faruqi
                                          Nina M. Varindani
                                          369 Lexington Avenue, 10th Floor
                                          New York, New York 10017
                                          Telephone: 212-983-9330
                                          Facsimile:  212-983-9331

                                          **FARUQI & FARUQI, LLP**
                                          Stuart J. Guber
                                          Timothy J. Peter
                                          101 Greenwood Avenue, Suite 600
                                          Jenkintown, PA 19046
                                          Telephone: 215-277-5770
                                          Facsimile:  215-277-5771

**HYNES   KELLER   &   HERNANDEZ, LLC**
Michael J. Hynes
Ligaya T. Hernandez
1150 First Avenue, Suite 501
King of Prussia, PA  19406
Telephone: 610-994-0292
Facsimile: 914-752-3041


*Attorneys for Plaintiff*